Anthony Joseph **MAJOY**, Petitioner–Appellant,

v.

Ernest C. **ROE**, Warden, Respondent–Appellee.

No. 00–56521.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 3, 2002.

Filed July 11, 2002.

---

Verna Wefald, Pasadena, CA, for the petitioner-appellant.

John Yang, Deputy Attorney General, Los Angeles, CA, for the respondent-appellee.

Before: PREGERSON, TROTT, Circuit Judges, and FITZGERALD,* District Judge.

TROTT, Circuit Judge.

Petitioner Majoy stands convicted in California state court of (1) conspiracy to commit murder for financial gain, and (2) two counts of first degree murder for financial gain committed while lying in wait. His appeals and petitions for post-conviction relief in state court failed, and he is serving a life sentence in prison without parole. His petition in federal district court for a writ of habeas corpus, which is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, was dismissed with prejudice as untimely because it did not satisfy the applicable one-year statute of limitation. *See* 28 U.S.C. § 2244(d). The district court correctly determined that because Majoy filed a state habeas petition with the California Supreme Court on April 15, 1997, eight days before the one-year AEDPA limitation period, running from its enactment on April 24, 1996, would expire, he had eight days after the conclusion of the state habeas proceedings to file a timely federal petition. The California Supreme Court denied his petition on August 27, 1997, meaning that Majoy had to file his federal petition in early September of 1997 in order for it to be timely. However, he did not do so until September of 1998, rendering his petition untimely, unless saved by some other provision of law.

The district court rejected Majoy's claims that AEDPA's one-year statute of limitation did not bar his petition. Among his rejected theories were: (1) that state-created impediments extended the deadline, *see* § 2244(d)(1)(B); (2) that Majoy did not discover the factual basis for his claims until a date that would have made his petition timely, *see* § 2244(d)(1)(D); and (3) that equitable tolling based on extraordinary circumstances beyond Majoy's control should be applied to excuse his late filing. *See Calderon v. United States Dist. Court (Beeler)*, 128 F.3d 1283, 1288–89 (9th Cir.1997), *cert. denied*, 522 U.S. 1099, 118 S.Ct. 899, 139 L.Ed.2d 884 (1998), *overruled on other grounds, Calderon v. United States Dist. Court (Kelly)*, 163 F.3d 530, 540 (9th Cir.1998) (en banc), *cert. denied*, 526 U.S. 1060, 119 S.Ct. 1377, 143 L.Ed.2d 535 (1999).

---

* The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation.

Majoy argued also, "last but not least," that the "actual innocence gateway" of *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), was available to him to overcome his untimeliness. Respondent Roe did not respond to this argument, and neither the magistrate judge in his Report and Recommendation, to which Majoy objected, nor the district court in its final order adopting that report, mentioned this issue. We granted a certificate of appealability with respect to (1) whether the district court properly dismissed appellant's petition as untimely, and (2) whether appellant is entitled to equitable tolling of the statute of limitation, referencing 28 U.S.C. § 2253(c)(3) and § 2244(d). Respondent Roe argues that this certificate is not broad enough to encompass the *Schlup* issue; we construe the certificate to include it. *See* 28 U.S.C. § 2253.

**I**

The particularly ugly facts surrounding this conspiracy and double parricide need not be recounted in excruciating detail. Suffice it to say that two avaricious and ungrateful sons, Neil and Stewart Woodman, engaged the deadly services of accomplished killers to eliminate their parents on September 25, 1985 in order (1) to gain an advantage in a nasty business feud fueled by sibling rivalry, and (2) to collect on their mother's $500,000 insurance policy. Majoy's alleged role in this sordid scheme was to assist the hired killers, Steven and Robert Homick, before and during the homicides by (1) providing his accomplices with information about the victims' whereabouts, and (2) acting as a lookout on Yom Kippur, the day of the attack.

At the core of Majoy's eleven claims is the fact that his conviction rests in large measure on the testimony of an accomplice, Michael Dominguez, who, in exchange for a lesser sentence and a representation that he was "not the shooter," originally told the police that Majoy participated in the planning phase of the conspiracy and then the murders themselves. Dominguez so testified and was cross-examined at Majoy's preliminary hearing, but the trouble for the prosecution started when Dominguez flatly refused to testify at Majoy's trial. As a consequence, the trial judge determined at the prosecution's urging that Dominguez was "unavailable" as a witness, and Dominguez's preliminary hearing testimony—bolstered by portions of a videotaped interview Dominguez had with the police—was introduced in evidence at trial. This evidence furnished the foundation for Majoy's conviction.

After Majoy's trial, one of the Woodman brothers, Stewart, cut a deal with the prosecution and confessed his guilt. In the course of telling the authorities everything he knew about the murders, he said that Steven Homick had told him who was at the crime scene but did not name Majoy. Majoy used this newly-discovered evidence in an unsuccessful attempt to secure a new trial. The California Court of Appeal supported the denial of Majoy's request for a new trial on the grounds that the evidence was hearsay and did not, by omission of his name, exonerate the petitioner. *California v. Majoy,* No. B052619, slip op. at 61 (Cal.Ct.App. Jan. 27, 1997). Undeterred, Majoy continues to point to this omission as evidence that he was not involved and is innocent.

The prosecution's problems continued to escalate. After Majoy was sentenced, Dominguez, a self-confessed murderer, arsonist, and robber, wrote letters to two Superior Court judges alleging that he had falsely implicated Majoy in the conspiracy as a facilitator and a lookout, and that he had done so because of police prompting and coercion. This complication intensified: during the second trial of Neil Wood-

man and the Homick brothers, Dominguez took the stand and announced that he lied repeatedly to the police and in the transcripts used to convict Majoy.

Through much of this piecemeal process, the prosecution maintained, on the basis of Dominguez's original testimony, that Majoy was the black-clad "Ninja" lookout observed by a neutral bystander witness, Roger Backman, fleeing the scene of the crime after the killings. The California Court of Appeal described Backman's testimony as follows:

> Between 10:00 and 11:00 p.m., Roger Backman was visiting his mother in the apartment building next door to where the Woodmans lived. He heard five gunshots: two in rapid succession followed by a pause, and then three more in quick succession. Mr. Backman ran out to the balcony area. He looked down to the walkway which ran between the buildings. He then heard noises in some bushes which sounded like someone coming in his direction and someone else running in the opposite direction.
>
> Mr. Backman next saw a person come out of the bushes from the next building, and run along bushes which were next to a brick wall. The person came over the top of the wall and landed on the walkway of Mr. Backman's mother's building. Mr. Backman still heard other rustling noises in the bushes, moving in the direction of the street, suggesting to him that someone else was going in that direction.
>
> When the man jumped the wall, Mr. Backman yelled down to him. The man stopped for a few seconds in a crouched position, and looked up. Mr. Backman could observe that the man was dressed in black from head to toe, including a black hood. Mr. Backman observed that the hood had eye openings and was secured around the neck. He did not

believe that it was a sweatshirt-type hood. For the two or three seconds Mr. Backman observed the man, all he could see were the eyes. Before the man took off running north in the alley, Mr. Backman looked at the person's hands, but did not see any gun.

The California Court of Appeal, encouraged to do so by the attorney general, treated this evidence as independent corroboration of Dominguez's testimony inculpating Majoy:

> Finally, independent corroboration, no matter how slight in value it might appear to be when standing alone, implicated appellant in the conspiracy and murders. Dominguez described appellant as wearing a black-hooded sweatshirt on the night of the murders. Roger Backman testified that the figure who ran from where the Woodmans had been murdered was wearing a black hood, although he did not describe it as a sweatshirt.

However, in the second trial of Neil Woodman, Roger Backman identified—or described—the "Ninja" in such a way arguably as not only to exclude the middle-aged Majoy, but to implicate the youthful Dominguez as the Ninja lookout.

This pivotal moment occurred when defense counsel showed Backman a series of photographs marked as People's Exhibit No. 2 which contained a photograph of petitioner Majoy, marked as "E", and a photograph of Dominguez, marked as "F". Counsel showed the photograph to Backman in an attempt to identify the wall-jumping "Ninja."

> Q [By Defense Counsel]—When you reviewed these series of photographs in the past, it was your—you would agree that the person marked in F [Dominguez] is the one that most closely resembled the person that you saw down in the walkway on the night in question?

A [By Backman] The most logically, Yes, would be F.

Q Well, you say 'most logically'. You're basing that on color of skin?

A Yes, my assumption of when I first initially saw that person on the sidewalk in a crouched position and identified the tone of his skin through the mask—the hood that he was wearing. That was my best logical conclusion that—of that particular type build and particular olive type skin. That's why I best logically picked this particular photograph.

Q So the person in F [Dominguez] has the same colored olive skin that you saw on the person on the night in question?

A Yes.

Q This person has the same build as the person in the walkway?

A He appears to have the same build, Yes.

Q Do the eyes also appear to be the same?

A Yeah. They appear to be somewhat the same, Yes.

Q Other than that, you can't say if this was the man that was down there or it wasn't the man that was down there, correct?

A Correct, correct.

Q Now, the only part that you saw on the night in question was the part between my fingers just above his eyebrows and just below the tip of the nose?

A Correct.

Q And that's the very same description that you gave to the police officers right there and then when they came out a

few minutes after you made these observations; Isn't it?

A Yes.

Q Olive tone skin, the person was Hispanic or Asian?

A Yes.

Q Five foot eight to five nine?

A Yes.

Q A hundred and sixty pounds, athletic?

A Yes.

Q And he was about twenty-five years old?

A Roughly, give or take. I believe I may have mentioned somewhere in his twenties.

Q That's the other reason that you feel the person in F [Dominguez] is most logical or the most logical—most logically resembles the age?

A Yes.

## II

■■■ All of these post-trial developments raise in our view the distinct possibility that given the opportunity, Majoy may be able to muster a plausible factual case meeting the exacting gateway standard established by the Supreme Court in *Schlup* for overriding a petitioner's clear failure to meet deadlines and requirements for filing a timely petition in federal court. Under *Schlup*, a petitioner's "otherwisebarred claims [may be] considered on the merits ... if his claim of actual innocence is sufficient to bring him within the 'narrow class of cases ... implicating a fundamental miscarriage of justice.'" *Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir.1997) (en banc) (quoting *Schlup*, 513 U.S. at 315, 115 S.Ct. 851).[1] In order to pass through

---

1. A claim that one should pass through the *Schlup* gateway is " 'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.' " *Schlup,* 513 U.S. at 315, 115 S.Ct. 851 (quoting *Herrera v. Collins,* 506

*Schlup's* gateway, and have an otherwise barred constitutional claim heard on the merits, a petitioner must show that, in light of all the evidence, including evidence not introduced at trial, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327 115 S.Ct. 851,. A petitioner need not show that he is "actually innocent" of the crime he was convicted of committing; instead, he must show that " 'a court cannot have confidence in the outcome of the trial.' " *Carriger*, 132 F.3d at 478 (quoting *Schlup*, 513 U.S. at 316, 115 S.Ct. 851).

Here, if a factfinder should conclude that Dominguez's post-trial claims are credible, and that in light of Backman's testimony and other evidence Majoy was neither the "Ninja" nor otherwise culpable, then the *Schlup* gateway would seem to open. On the other hand, if Dominguez's recantation is the familiar, untrustworthy, and unreliable about-face by a self-interested criminal,[2] as argued by the Respondent and echoed by the California Court of Appeal in denying Majoy's petition for a writ of habeas corpus, then Majoy's petition will have failed. As Justice Stevens said in *Schlup*, "[t]o be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new *reliable* evidence ... that was not presented at trial." 513 U.S. at 324, 115 S.Ct. 851 (emphasis added).

 In summary, we conclude on this record that Majoy might fall within the narrow class of cases implicating a fundamental miscarriage of justice. *Id.* at 315, 115 S.Ct. 851; *Carriger*, 132 F.3d at 477. If he does, the question to be answered is whether surviving the rigors of this gateway has the consequence of overriding AEDPA's one-year statute of limitation, a legal question not yet decided by this Circuit or the Supreme Court.[3] If the answer to this question is in the affirmative, then his otherwise-barred claims must be heard on the merits. *See Triestman v. United States*, 124 F.3d 361, 378–79 (2d Cir.1997) (observing in dicta that the procedural denial under AEDPA of collateral review to a party claiming actual innocence could raise serious constitutional problems); *see also Miller v. Marr*, 141 F.3d 976, 978 (10th Cir.1998) (noting that if AEDPA's statute of limitation prevented a petitioner who is actually innocent from filing a first federal habeas petition, AEDPA's limitation period would "raise[ ] serious constitutional

U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)).

**2.** *See e.g., United States v. Zuno–Arce*, 25 F.Supp.2d 1087, 1093–94 (C.D.Cal.1998), *aff'd on other grounds*, 209 F.3d 1095 (9th Cir.2000) (finding informer—witness altered his story multiple times depending on to whom he was talking).

**3.** We reject Majoy's other theories that the one-year statute of limitation is not a bar to hearing his petition. We conclude on this record, as did the district court, first, that contrary to Majoy's assertions, the separate trial of other defendants did not cause a state-created impediment to a timely filing. Moreover, Majoy's claims that *Brady* violations created such an impediment are made for the

first time on appeal. Because he did not advance this argument in district court, it is waived.

Second, Majoy's assertion that he did not—and could not—discover the factual predicates for his claims until 1998 is refuted by the record. Furthermore, he has not made an adequate showing of due diligence as required by § 2244(d)(1)(d) to invoke this tolling provision.

Third, he fails to make a convincing case for equitable tolling, a case that requires extraordinary circumstances beyond his control. *See Kelly*, 163 F.3d at 541. His attempt to place blame on his previous attorney and to assign his reliance on that attorney having made timely filing "impossible" falls short of the circumstances required to engage this exception.

questions and possibly render[ ] the habeas remedy inadequate and ineffective"); *In re Dorsainvil*, 119 F.3d 245, 248 (3d Cir. 1997) (observing that "[w]ere no other avenue of judicial review available for a party who claims that s/he is factually or legally innocent . . . we would be faced with a thorny constitutional issue"); *Zuno–Arce*, 25 F.Supp.2d at 1102 ("[T]o foreclose a claim of constitutional violation where there has been a colorable showing of factual innocence would likely constitute a due process violation or an improper suspension of habeas corpus relief"); *Alexander v. Keane*, 991 F.Supp. 329, 334–39 (S.D.N.Y.1998).

This important legal question, however, is not appropriately addressed by us in a hypothetical context. Unless and until Majoy establishes under examination and adversarial testing to the satisfaction of the appropriate factfinder that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," *Schlup*, 513 U.S. at 327, 115 S.Ct. 851; *Carriger*, 132 F.3d at 478, we express no opinion on either issue.

Thus, as the Supreme Court observed in *Schlup*: "The fact-intensive nature of this inquiry, together with the District Court's ability to take testimony from the few key witnesses if it deems that course advisable, convinces us that the most expeditious procedure is . . . to remand to the District Court for further proceedings consistent with this opinion." *Schlup*, 513 U.S. at 332, 115 S.Ct. 851.[4]

We fully recognize, as Respondent Roe argues, that other facts in this case, as arrayed by the California Court of Appeal in an unpublished opinion,[5] tend to corroborate Dominguez's original statement to the police as well as his preliminary hearing testimony to the effect that Majoy was a knowing participant in this plot. These facts include: (1) Majoy's association with the thugs for hire; (2) Majoy's writings that tend to identify the date and neighborhood of the murder; (3) his failed alibi; and (4) his receipt after the murders of $25,000 and some jewelry. Nevertheless, not one of these circumstantial facts—taken alone or in any combination—convinces us—should Dominguez's recantation and exculpatory evidence be determined to be reliable—that any rational juror would find them sufficient to convict Majoy beyond a reasonable doubt. We note here that at no time has an evidentiary hearing ever been held on this issue.

We have no doubt that Majoy is no angel and lacks the morals one would hope to find in a citizen of this nation. By his own account, he had more than sufficient reason to believe that the Homicks intended to harm someone, and he lifted not one finger nor spoke one word to derail their plot. Nevertheless, such information without more is not sufficient to convict anyone of a crime. The evidence of "more" in this case comes essentially from an outlaw witness who had a clear motive to lie to save himself and who now claims to have committed perjury against Majoy to promote his own interests. Accordingly, we leave it

---

**4.** As to Majoy's allegations that the prosecution still may not have lived up to its duty to discover and to turnover all available exculpatory evidence, *see Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *N. Mariana Islands v. Bowie*, 243 F.3d 1109 (9th Cir.2001), we leave the resolution of this issue to the district court on remand. However, in a separate order, we deny Majoy's request for a limited remand to the district court to decide if the statute of limitation has "even begun to run" based on the prosecution's alleged misconduct.

**5.** *California v. Majoy*, No. B052619, slip op. at 39–40, 72 (Cal.Ct.App. Jan. 27, 1997).

to the skills of the district court to determine in the first instance whether Majoy's conviction is grounded on perjury, *see Killian v. Poole,* 282 F.3d 1204 (9th Cir.2002), and, whether a claim of actual innocence as defined by *Schlup* has been established. If so, the court will then need to decide what consequence such a finding has with respect to AEDPA's one-year statute of limitation. We note here the statement by the Supreme Court in *Schlup* that it has "repeatedly noted the interplay between statutory language and judicially managed equitable considerations in the development of habeas corpus jurisprudence." *Schlup,* 513 U.S. at 319 n. 35, 115 S.Ct. 851; *see also Lonchar v. Thomas,* 517 U.S. 314, 324, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996) ("Dismissal of a *first* federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty."); *O'Neal v. McAninch,* 513 U.S. 432, 442, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (describing the "basic purpose[ ] underlying the writ" as the correction of an error "that risks an unreliable trial outcome and the consequent conviction of an innocent person").

We note also that "it is not the district court's independent judgment as to whether reasonable doubt exists," but whether "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 329, 115 S.Ct. 851. In this regard, the "habeas court must make its determination concerning the petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial.'" *Id.* at 328, 115 S.Ct. 851

(quoting Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,* 38 U. Chi. L.Rev. 142, 160 (1970)).

REVERSED and REMANDED for further proceedings consistent with this opinion.