WALLACE, Senior Circuit Judge.
 

 Petitioner James Griffin appeals from the district court’s denial of his amended petition for habeas corpus relief. He argues that the district court erred (1) in concluding that his newly presented evidence did not establish actual innocence with respect to his proeedurally defaulted ineffective assistance of counsel claim, and (2) in denying an evidentiary hearing on his actual innocence claim. We have jurisdiction to review Griffin’s petition pursuant to 28 U.S.C. § 1291 and 28 U.S.C. § 2253(a), and we affirm.
 

 
 *907
 
 I.
 

 In February 1991, Griffin met Roseanne Walter at a soup kitchen in Medford, Oregon. Witnesses reported seeing Griffin and Walter driving around town together following this initial encounter. When Walter’s body turned up several days later partially burned with multiple stab wounds, Medford police charged Griffin with intentional murder.
 

 Shortly after being indicted for Walter’s murder, Griffin obtained summaries of his psychiatric records from Camarillo State Hospital, where he had been institutionalized intermittently throughout his childhood and adolescence. Griffin’s discharge summaries from Camarillo indicate that he suffers from “Non-Psychotic Organic Brain Syndrome.” Griffin presented this information to his attorney, Justin Smith. He also informed Smith that another Oregon trial court had requested psychiatric evaluations in connection with a prior attempted rape conviction and alleged that these evaluations reached the conclusion that he suffered a mental disease or defect requiring psychiatric care. Smith apparently ignored this information and made no effort to assert the insanity defense Griffin desired.
 

 Instead, Smith based Griffin’s defense in part on representations from a state forensic expert’s report that stated a fingerprint found on the murder weapon belonged to someone other than Griffin. Immediately after selection of the jury on July 8, 1993, the prosecution informed Smith that the expert changed his mind, deciding to testify that he could not rule out Griffin as the fingerprint’s source. This sudden shift in the evidentiary landscape compromised Smith’s defense strategy.
 

 Hasty plea negotiations ensued. State prosecutors, who had been planning to urge the judge to impose a determinate life sentence, proposed a twenty-five-year sentence in exchange for a guilty plea. Smith relayed the state’s offer to Griffin, explaining for the first time that the state would seek a life sentence if a trial were to lead to Griffin’s conviction. Griffin decided to plead guilty. At the plea colloquy on July 12, 1993, he executed a two-page plea petition in which he affirmed that he understood the plea agreement and was satisfied with Smith’s services.
 

 In 1994, Griffin applied for state post-conviction relief. He alleged under Oregon law that he did not enter his plea voluntarily and intelligently, that the trial court failed to sustain the plea’s factual basis, and that the sentence imposed was excessive and improper. He also claimed to have received ineffective assistance of counsel under both the stated and federal constitutions. Griffin did not offer the post-conviction court any evidence (e.g., hospital records, medical records, or psychiatric evaluations) to substantiate his alleged mental disorder, nor did he call upon Smith to testify as to whether he investigated Griffin’s alleged mental illness. The state court denied relief on both claims of error.
 

 Griffin appealed. His brief abandoned the state law and ineffective assistance claims, asserting instead that Smith’s representation was tainted by a conflict of interest because he had prosecuted Griffin on multiple previous occasions while serving as a district attorney. The Oregon Court of Appeals affirmed without opinion, and Griffin did not seek review by the Oregon Supreme Court.
 

 In 1998, Griffin petitioned for federal habeas corpus relief, alleging that (1) Smith did not provide effective assistance because, in part, he had a conflict of interest, (2) trial counsel “coerced [him] into entering a plea of guilty,” (3) the trial court should have granted a motion to
 
 *908
 
 change venue, and (4) the sentence imposed was unlawful. His ineffective assistance of counsel claim was not based on Smith’s failure to pursue an insanity defense. In 2000, he amended this petition, however, abandoning his former allegations and arguing instead that (1) he received ineffective assistance of counsel when Smith failed to investigate his mental-health history and advised him to plead guilty, (2) he received ineffective assistance of counsel when Smith allowed him to enter a guilty plea that was unknowing and involuntary, and (3) the trial court accepted his plea without determining whether it was knowing and voluntary. Griffin acknowledged that he failed to exhaust his state court remedies in petitioning the Oregon Court of Appeals for review.
 

 A magistrate judge recommended denying habeas corpus relief because Griffin procedurally defaulted on all his claims and failed to clear the procedux-al bar through either the “cause and prejudice” or “actual innocence” gateways of
 
 Schlup v. Delo,
 
 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). On de novo review, the district court adopted the magistrate judge’s findings and recommendations in their entirety. Thereafter, the district court issued a Certificate of Appealability (COA) under 28 U.S.C. § 2253(c) for Griffin’s claim that Smith rendered ineffective assistance of counsel.
 

 II.
 

 The COA limits this appeal to the issue of whether Griffin received ineffective assistance of counsel because (1) Smith failed to investigate his mental-health history, and (2) Smith allowed him to enter a guilty plea that was not knowing or voluntary due to his alleged incompetence. Griffin requests that we expand our review to consider issues beyond the COA’s scope, but Circuit Rule 22-1 (d) does not permit us to do so:
 

 If the district court denies a certificate of appealability in part, the court of appeals
 
 will not consider uncertified issues
 
 unless petitioner first seeks, and the court of appeals grants, broader certification. Petitioners desiring broader certification must file, in the court of appeals, a separate motion for broader certification, along with a statement of reasons why a certificate should be granted as to any issue(s) within thirty-five days of the district court’s entry of its order denying a certificate of appeal-ability.
 

 (9TH CiR. R. 22 — 1(d)) (emphasis added). Failure to comply with the Circuit Rule’s procedure is a ground for denying the request, which we do here.
 
 United States v. Christakis,
 
 238 F.3d 1164, 1168 n. 5 (9th Cir.2001).
 

 We review de novo a district court’s dismissal of a section 2254 habeas petition based on procedural default.
 
 Cockett v. Ray,
 
 333 F.3d 938, 941 (9th Cir.2003). A district court’s findings of fact are reviewed for clear error.
 
 Killian v. Poole,
 
 282 F.3d 1204, 1207 (9th Cir. 2002).
 

 Since Griffin procedurally defaulted the constitutional violation he alleges in his petition, he may not present it in federal habeas proceedings unless he first demonstrates that (1) “cause and prejudice” excuses the default, or (2) the dismissal of his appeal would produce “a miscarriage of justice.”
 
 Kibler v. Walters,
 
 220 F.3d 1151, 1153 (9th Cir.2000). Griffin does not attribute his default to “cause.” We limit our review, therefore, to determining whether the miscarriage of justice exception applies.
 

 To establish a “miscarriage of justice,” Griffin must “present evidence of
 
 *909
 
 innocence strong enough that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.”
 
 Carriger v. Stewart,
 
 132 F.3d 463, 478 (9th Cir.1997) (en banc) (emphasis and internal quotations omitted),
 
 quoting Schlup,
 
 513 U.S. at 316, 115 S.Ct. 851. To meet this standard, Griffin must first furnish “new rehable evidence ... that was not presented at trial.”
 
 Schlup,
 
 513 U.S. at 324, 115 S.Ct. 851. This evidence must show that “it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.”
 
 Id.
 
 at 327, 115 S.Ct. 851.
 

 Both parties accept these propositions, but they propose different formulas for ascertaining whether particular exculpatory evidence qualifies as “new reliable evidence” under
 
 Schlup.
 
 Respondent Johnson contends that Griffin must provide “newly discovered” evidence concerning his alleged mental defect (i.e., evidence uncovered only after trial). The district court agreed, relying on
 
 Sistrunk v. Armenakis,
 
 No. 96-6279, 1999 WL 717214, (D.Or. Sept.15, 1999), a decision we subsequently vacated.
 
 Sistrunk v. Armenakis,
 
 292 F.3d 669 (9th Cir.2002) (en banc). Griffin challenges this test, arguing that
 
 Schlup
 
 requires only “newly presented evidence” (i.e., evidence that was not before the trial court). He relies on our statement in
 
 Majoy v. Roe
 
 that “a petitioner must show that, in light of all the evidence,
 
 including evidence not presented at trial,
 
 ‘it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.’ ” 296 F.3d 770, 776 (9th Cir.2002)(emphasis added),
 
 quoting Schlup,
 
 513 U.S. at 327, 115 S.Ct. 851.
 

 The distinction between “newly discovered” evidence and “newly presented” evidence is significant here, because Griffin’s actual innocence claim relies in part on evidence that he discovered prior to the entry of his guilty plea, but did not offer into evidence then, namely hospital records from the early 1970s that were in his possession at commencement of trial but never came before the court. Thus, before we evaluate whether Griffin’s evidence establishes actual innocence, we first must decide whether the
 
 Schlup
 
 gateway requires “newly discovered” evidence or merely “newly presented” evidence.
 

 A.
 

 We start with Justice Stevens’s majority opinion in
 
 Schlup:
 
 “To be credible, [an actual innocence] claim requires petitioner to support his allegations of constitutional error with
 
 new reliable evidence
 
 — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical
 
 evidence
 
 — that
 
 was not presented at trial.” Schlup,
 
 513 U.S. at 324, 115 S.Ct. 851 (emphasis added). Considered in isolation, this language could support either the Respondent’s narrow “newly discovered” theory or Griffin’s broader “newly presented” theory, but other passages in Justice Stevens’s opinion suggest that a habeas petitioner may pass through the
 
 Schlup
 
 gateway without “newly discovered” evidence if other reliable evidence is offered “that was not presented at trial.”
 
 E.g., id.
 
 at 327-28, 115 S.Ct. 851 (adopting Judge Friendly’s assertion that “actual innocence” review must incorporate
 
 “all evidence,
 
 including that alleged to have been admitted illegally (but with due regard to any unreliability of it) and
 
 evidence tenably claimed to have been wrongfully excluded
 
 or to have become available only after the trial” (emphasis added)
 
 (quoting
 
 Henry J. Friendly,
 
 Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,
 
 38 U. Chi. L.Rev. 142, 160 (1970)));
 
 id.
 
 at 330, 332, 115 S.Ct. 851
 
 *910
 
 (describing a petitioner’s burden of production in terms of “newly presented evidence”).
 

 Justice O’Connor’s separate concurring opinion, however, prevents us from readily concluding that only “newly presented evidence” is required under
 
 Schlup.
 
 Justice O’Connor delivered a crucial vote and wrote separately “to explain, in light of the dissenting opinions, what [she] understood] the Court to decide and what it d[id] not.”
 
 Id.
 
 at 332, 115 S.Ct. 851. Her “understanding]” is that:
 

 The Court holds that, in order to have an abusive or successive habeas claim heard on the merits, a petitioner who cannot demonstrate cause and prejudice ‘must show that it is more likely than not that no reasonable juror would have convicted him’ in light of
 
 newly discovered
 
 evidence of innocence.
 

 Id.
 
 (emphasis added). Justice O’Connor clearly employs the term “newly discovered.” Thus, her opinion could constitute Schlup’s holding. See
 
 Marks v. United States,
 
 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (stating that when “a fragmented Court” made its decision without a unifying rationale, “the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds”
 
 {quoting Gregg v. Georgia,
 
 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976))). On the other hand, it might be considered only to rebut the dissenter’s objections without formulating controlling law.
 

 We might be compelled to speculate further had our court not already stated that actual innocence claims require only “newly presented” evidence. In
 
 Sistrunk v. Armenakis,
 
 we decided that physical evidence excluded at trial could satisfy Schlup’s gateway requirement notwithstanding the fact that it was not “newly discovered.” At Sistrunk’s state rape trial, his eleven-year-old accuser described bumps on Sistrunk’s penis in the course of identifying Sistrunk as her alleged assailant. 292 F.3d at 671. Sistrunk’s counsel moved to admit into evidence photographs that showed Sistrunk’s penis did not meet this description, but the trial court ordered them excluded.
 
 Id.
 
 On review, despite recognizing that the physical attributes of Sistrunk’s penis were not “newly discovered,” we concluded nonetheless that “Sis-trunk’s evidence [was] newly presented, and thus, may be considered in analyzing his
 
 Schlup
 
 claim.”
 
 Id.
 
 at 673 n. 4. Although the magistrate judge had recommended that only “newly-discovered evidence” would satisfy
 
 Schlup,
 
 we held that no error resulted from this potential “misapplication of the
 
 Schlup
 
 standard” because “a close review of the magistrate judge’s order ... disclose[d] that the magistrate judge did, in fact, consider all of the evidence offered by
 
 Sistrunk." Id.
 

 Our subsequent opinion in
 
 Majoy v. Roe
 
 is consistent with
 
 Sistrunk,
 
 as we strongly suggested in
 
 Majoy
 
 that habeas petitioners need not produce “newly discovered” evidence to meet the
 
 Schlup
 
 test. Majoy’s habeas petition presented three pieces of evidence that surfaced after his trial: (1) the confession of an alleged co-conspirator, (2) the recantation of the prosecution’s main witness, and (3) post-trial testimony from a third' witness. 296 F.3d at 774-75. Since none of this evidence had been available during Majoy’s original trial and thus constituted “newly discovered” evidence, it was unnecessary to decide if only newly discovered evidence qualified under
 
 Schlup.
 
 Nevertheless, we described Schlup’s gateway in the broader terms:
 

 In order to pass through Schlup’s gateway, and have an otherwise barred constitutional claim heard on the merits, a petitioner must show that, in light of all
 
 *911
 
 the evidence,
 
 including evidence not introduced at trial,
 
 “it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.”
 

 Id.
 
 at 775-76 (emphasis added). We framed the relevant question not as whether the new evidence was
 
 available to the defendant
 
 during his trial, but rather as whether the new evidence was
 
 introduced to the jury
 
 at trial.
 
 Id.
 
 at 776. Because “Majoy might fall within the narrow class of eases implicating a fundamental miscarriage of justice,” we held that his “otherwise-barred claims must be heard on the merits.”
 
 Id.
 

 Based on the statements and reasoning of
 
 Sistrunk
 
 and
 
 Majoy,
 
 we hold that habeas petitioners may pass Schlup’s test by offering “newly presented” evidence of actual innocence. Our conclusion leads us to inquire whether Griffin’s medical records from Camarillo Hospital and the Oregon Department of Corrections, as well as Dr. Stanulis’s subsequent reports and opinions, qualify as “newly presented” evidence. The Camarillo records were allegedly in Griffin’s possession before trial, but he never offered this evidence prior to accepting the plea bargain. Griffin’s Oregon Department of Corrections records necessarily could not be trial evidence as they document his post-conviction psychological profile. The same reasoning applies to Dr. Stanulis’s evaluations that were drafted years after Griffin’s conviction. Because none of this evidence was presented to the trial court, we conclude that it constitutes “new ... evidence ... that was not presented at trial,”
 
 Schlup,
 
 518 U.S. at 324, 115 S.Ct. 851.
 

 B.
 

 In order to pass through the
 
 Schlup
 
 gateway, Griffin must show that with the new evidence “it is more likely than not that no reasonable juror would have convicted him.”
 
 Schlup,
 
 513 U.S. at 327, 115 S.Ct. 851;
 
 Sistrunk,
 
 292 F.3d at 673. In other words, Griffin’s medical records and expert evaluations must constitute “evidence of innocence so strong that [we ] cannot have confidence in [Griffin’s guilty plea].”
 
 Schlup,
 
 513 U.S. at 316, 115 S.Ct. 851. Since Griffin’s actual innocence claim invokes Oregon’s insanity defense, we must decide whether his new evidence demonstrates that “as a result of mental disease or defect at the time of engaging in criminal conduct, [he ] lack[ed] substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law.” Or. Rev. Stat. § 161.295(1).
 

 1.
 

 Griffin’s Camarillo hospital records include discharge summaries from two periods of institutionalization: March 1965 to July 1970 and November 1970 to August 1971. The first discharge summary, which addresses Griffin’s medical history between the ages of nine and fourteen, diagnoses Griffin with “Chronic Brain Syndrome Associated with Convulsive Disorder with Behavioral Reaction.” The summary states that Griffin has “a history of aggressive behavior” and “gets a lot out of teasing and horseplaying at times with other patients,” but it also describes Griffin as showing “no overt evidence of psychosis” and concludes that “[h]e is well oriented in all spheres and seems to be able to make a good adjustment with both patients and employees at this time.”
 

 The second discharge summary was dated the following year when Griffin was hospitalized once again “because of unadapted behavior and ... failure to adjust.” The hospital note states that “[w]e have worked with him and he has been able to
 
 *912
 
 show increasingly satisfactory adjustment.” Doctors cautioned that Griffin displayed “a tendency ] to tease others to get a response from them and then get into physical wrestling with them over it.” Nevertheless, they wrote that Griffin experienced “no difficulty in peer association” and “has not been psychotic,” and therefore discharged him as “not mentally ill” with “Non-Psychotic Organic Brain Syndrome” and “Epilepsy.”
 

 These records do not demonstrate that with them “it is more likely than not that no reasonable juror would have convicted” Griffin. The hospital records do not diagnose Griffin as mentally ill. At most, they depict a troubled youth with an “aggressive,” physical disposition who had trouble adapting to new social environments. This evidence alone would not lead a reasonable juror to conclude that Griffin could not form the criminal intent necessary to commit a murder that occurred over twenty years later.
 

 2.
 

 Griffin’s first prison medical record, filed in 1993, describes him as “alert and oriented,” but a note reports that “his affect was flat at times and his mood was quiet.” Griffin’s doctor apparently prescribed Mel-laril, an anti-psychotic medication, which Griffin had taken previously. The record states that Griffin struggled with alcohol abuse and depression, but rules out mixed personality disorder. It also indicates that Griffin discussed his murder conviction with his doctor. During the conversation, Griffin apparently described Walter as “a snitch and [a] rat” who “liked to set people up and lie about them.” Griffin explained that Walter’s conduct “made him mad so he went out and stabbed her to death.” Far from demonstrating Griffin’s alleged incapacity “to appreciate the criminality of [his] conduct or conform [his] conduct to the requirements of law,” OR. Rev. Stat. § 161.295(1), this 1993 prison record strongly suggests that Griffin killed Walter deliberately with full appreciation of the nature of his conduct.
 

 Subsequent reports filed over the following three years report that Griffin experienced occasional hallucinations but “found no other signs of any thought disorder.” Although Griffin “knows that he has been diagnosed as an[sic] organic brain syndrome in the past,” Griffin’s doctor explains that he was “oriented as to time, place and person” and showed “no signs of any psychotic thinking.” In 1995, the doctor stated that he “certainly d[id] not see [Griffin] as being a danger to himself or others,” a conclusion the doctor reaffirmed the following year.
 

 These prison records do not demonstrate that “it is more likely than not that no reasonable juror would have convicted” Griffin of murder. While in prison, Griffin apparently showed no sign of mental disease or defect that would make him a danger to himself or others, nor did he have any difficulty conforming his behavior to prison rules. None of his prison records indicates that he could not form the intent necessary to commit murder; if anything, his admission concerning his reasons for killing Walter reveals that he understood the nature of this action and acted with criminal intent.
 

 3.
 

 Dr. Stanulis, a psychologist, evaluated Griffin in 1999 at the Snake River Correctional Institution. Tests showed that Griffin’s I.Q. was 86 and revealed “strong indicators of frontal lobe dysfunction” and “other indicators of brain injury including difficulty with alternating attention and concentration.” Based on these tests, Dr. Stanulis opined that Griffin “suf
 
 *913
 
 fers from an Organic Brain Syndrome,” impairing his “ability to plan, initiate, and sequence behavior.” He also diagnosed Griffin as suffering from Post Traumatic Stress Disorder due to past physical and sexual abuse. The evaluation concludes in part:
 

 In regards to the crime for which [Griffin] has been convicted, clearly it was a crime of an aggressive nature. It is quite clear that Mr. Griffin’s mental defect includes the symptom of uncontrolled aggression.... Certainly these facts would tend to indicate that Mr. Griffin may not have been able to form the required intent for the crime for which he was convicted. It is my opinion that his mental disease and defect in fact make it quite unlikely that he formed the specific intent necessary for the crime he was alleged to have committed ....
 

 Griffin argues that this evaluation helps demonstrate that he “could not have formed the requisite mental intent to be guilty of murder.”
 

 Dr. Stanulis’s evaluation, however, is not sufficiently compelling to justify the conclusion that Griffin’s conviction would constitute a miscarriage of justice. “Because psychiatrists [let alone psychologists] disagree widely and frequently on what constitutes mental illness,” we have observed that evaluations such as Dr. Stanulis’s merit little weight on habeas review because “a defendant could ... always provide a showing of factual innocence by hiring psychiatric experts who would reach a favorable conclusion.”
 
 Harris v. Vasquez,
 
 949 F.2d 1497, 1515 (9th Cir.1990) (internal quotation marks and citation omitted). For this reason, we have stated that “it is clear that the mere presentation of new psychological evaluations ... does not constitute a colorable showing of actual innocence.”
 
 Id.
 
 at 1516.
 

 In addition, Dr. Stanulis’s conclusion that Griffin
 
 “may
 
 not have been able to form the required intent for the crime for which he was convicted” (emphasis added) does not satisfy Griffin’s burden of proof because it is speculative on its face. Dr. Stanulis’s reasons for hedging are obvious: the record may disclose Griffin’s impulsive and aggressive tendencies, but it provides no evidence that Griffin has ever acted with uncontrolled aggression. Griffin’s “borderline” intelligence, memory problems, and concentration lapses also do not show that he lacked the specific intent to kill Walter. More importantly, under Oregon law, Griffin must demonstrate by a pre-ponderance of the evidence that he suffered from a disabling “mental disease or defect
 
 at the time of engaging in criminal conduct.”
 
 OR. Rev. Stat. § 161.295(1) (emphasis added);
 
 see also id.,
 
 § 161.305;
 
 State v. Counts,
 
 311 Or. 616, 816 P.2d 1157, 1161 (1991). Dr. Stanulis’s evaluation is minimally probative of Griffin’s capacity to murder Walter eight years earlier.
 
 See Harris,
 
 949 F.2d at 1515 (holding that a psychiatric evaluation performed thirteen years after commission of an offense did not establish actual innocence). For these reasons, it is highly unlikely that a jury would reach a different result based on Dr. Stanulis’s belated psychological evaluation.
 

 We agree, therefore, with the district court that Griffin has not shown that “it is more likely than not that no reasonable juror would have convicted him” if confronted with this new evidence.
 

 III.
 

 In the alternative, Griffin argues that we should remand to the district court for an evidentiary hearing even if the evidence accompanying his habeas petition is insufficient. The magistrate judge and district court rejected this argument, observing that federal courts may hold evi-
 
 *914
 
 dentiary hearings on habeas claims only under certain prescribed conditions:
 

 If the applicant has failed to develop the factual basis of a claim in state court proceedings,
 
 the court shall not hold an evidentiary hearing
 
 on the claim
 
 unless the applicant can show
 
 that—
 

 (A) the claim relies on—
 

 (I) a new rule of constitutional law ...; or
 

 (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
 

 (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.
 

 28 U.S.C. § 2254(e)(2) (emphasis added). Griffin does not rely on “a new rule of constitutional law,” and his actual innocence claim does not rely on facts “that could not have been previously discovered through the exercise of due diligence.”
 
 Id.
 
 By his own admission, he had access to his psychiatric profile throughout the state court proceedings and could have introduced the relevant facts before their conclusion. He has not shown that the facts underlying his actual innocence claim “establish by clear and convincing evidence that but for [ineffective assistance of counsel], no reasonable factfinder would have found him guilty of the underlying offense.”
 
 Id.
 
 Thus, section 2254(e)(2) dictates that Griffin is not entitled to an evidentiary hearing on his actual innocence claim.
 

 Griffin argues that section 2254(e)(2) does not apply to his actual innocence claim, because the claim did not become relevant until his other claims were proee-durally defaulted.
 
 See Williams v. Taylor,
 
 529 U.S. 420, 432, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (“Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner’s counsel.”). Notwithstanding the possible merit of Griffin’s argument, “[w]e need not and do not decide the issue of whether a request for an evidentiary hearing to determine issues regarding actual innocence falls under [section] 2254(e)(2) because regardless of whether [section] 2254(e)(2) applies, a hearing [is ] not necessary in this case.”
 
 Gandarela v. Johnson,
 
 286 F.3d 1080, 1087 (9th Cir.2002). Griffin “has failed to show what ... an evidentiary hearing might reveal of material import on his assertion of actual innocence.”
 
 Id.
 
 He has not established that an evidentiary hearing would produce evidence more reliable or more probative than the medical records and expert opinion that were before the district court. Therefore, we conclude that the district court did not abuse its discretion by deciding that an evidentiary hearing was unnecessary.
 
 Downs v. Hoyt,
 
 232 F.3d 1031, 1041 (9th Cir.2000).
 

 AFFIRMED.