[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10190

_____

JAMES THOMAS STIMPSON,

                                        Petitioner-Appellant,

*versus*

WARDEN,

                                        Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 4:19-cv-02050-MHH-HNJ

_____

Before BRASHER, HULL, and WILSON, Circuit Judges.

BRASHER, Circuit Judge:

This habeas appeal requires us to determine whether a petitioner demonstrated his actual innocence, by presenting impeachment evidence, to overcome the statute of limitations in the Anti-Terrorism and Effective Death Penalty Act of 1996. An Alabama jury convicted James Thomas Stimpson of solicitation to commit murder. The triggerman gave the police Stimpson's name and proceeded as a witness in the trial against him. In addition to the triggerman's testimony, the state presented other evidence connecting Stimpson to the solicitation, such as statements he made to other witnesses attempting to solicit them to commit a murder.

The state courts, in direct and postconviction proceedings, denied Stimpson's requests for relief. Stimpson filed an untimely federal habeas petition. In that petition, he argued that five pieces of evidence demonstrated his actual innocence sufficient to overcome the statute of limitations. But the district court determined that the evidence did not prove actual innocence because it merely impeached the triggerman's testimony. The district court dismissed his claims as untimely, and Stimpson asked this Court to review that decision. After careful review and with the benefit of oral argument, we affirm the district court.

## I.

As Loretta Gilbert was riding her motorcycle, Danny Chandler shot her, but she survived. Police questioned Chandler about

the shooting of Ms. Gilbert, and he confessed to the crime. He told police that James Thomas Stimpson hired him to kill her. A grand jury indicted Stimpson for criminal solicitation to commit murder, violating Ala. Code §§ 13A-4-1 and 13A-6-2(a)(1).

During Stimpson's trial, the state theorized that Stimpson facilitated the shooting on behalf of Ricky Gilbert, his long-time friend and Ms. Gilbert's estranged husband. That is, Stimpson served as the "middle man" between the solicited shooter, Chandler, and Mr. Gilbert. The jury heard conflicting evidence about who hired Chandler to shoot Ms. Gilbert and about Stimpson's alleged involvement. Stimpson's defense attorneys called, among other witnesses, three individuals who testified that Chandler said an unnamed "Mexican" gave him the car used for the attempted murder and told him to shoot Ms. Gilbert. The state called Chandler to testify, and he stated that Stimpson gave him a .38 revolver to shoot Ms. Gilbert. The state also called witnesses Todd Graves, who was Stimpson's coworker, and Police Chief Lanny Ransum to testify about Stimpson's statements before and after the shooting. The jury found Stimpson guilty of criminal solicitation to commit murder. The state circuit court sentenced him to thirty years' imprisonment.

Stimpson, represented by new counsel, appealed the conviction to the state criminal appellate court. He argued that the state presented insufficient evidence because the only evidence supporting his conviction came from Chandler—the person he allegedly solicited to commit the murder. The state appeals court rejected

this argument. According to that court, the state presented enough corroborative evidence to convict him. That evidence included the following facts: (1) Stimpson and Mr. Gilbert knew one another; (2) Todd Graves testified that Stimpson said someone could make money "by being a hit man or whacking somebody"; (3) Graves testified that Stimpson said he "kn[e]w somebody that needs to be whacked and I'll give you $15,000 to do it"; (4) Graves testified he saw Stimpson talking to Chandler several times before the shooting; (5) Chief Lanny Ransum testified that Stimpson initially denied involvement in the shooting, but then, one day later, asked Chief Ransum for a deal; and (6) Ms. Gilbert and Mr. Gilbert were going through a divorce at the time of the shooting. The state finalized this judgment after Stimpson failed to file an application for rehearing or a petition for writ of certiorari in the Alabama Supreme Court.

Stimpson then pursued state postconviction relief. He filed his first petition for postconviction relief during the pendency of his direct appeal, so the state court dismissed the petition without prejudice for that reason. Then in his second petition, which he timely filed, he asserted that newly discovered evidence established his innocence, along with an ineffective assistance of counsel claim, a *Brady* violation claim, and an allegation that the indictment was flawed. To support his new evidence claim, he presented Rickey Cash's and David Bone's jailhouse statements that Chandler lied about Stimpson's involvement. He also presented ballistic evidence that showed an inconsistency in Chandler's testimony regarding the gun Stimpson gave him. The court held an evidentiary

hearing as to the actual innocence contention and dismissed the other claims.

During the evidentiary hearing, two witnesses testified to the state's ballistics reports. The state created an original ballistics report, which said Ms. Gilbert had been shot with a .9-millimenter revolver. Later, the state had created an amended ballistics report, which was consistent with Chandler's trial testimony that he had used a .38 revolver. Stimpson's expert testified that the state made a mistake in either the original or amended ballistics report, and he had "never seen a .9-millimeter revolver." Then the state's witness observed that the evidence at trial indicated that someone shot Ms. Gilbert with a .38 special or .357 magnum revolver.

The state circuit court, after conducting the evidentiary hearing, denied Stimpson's claims of newly discovered material facts. First, the circuit court found that Bone's affidavit presented "merely impeachment" evidence of the witness Chandler. And the circuit court reasoned that Bone's testimony did not demonstrate that Stimpson was innocent because Bone never testified that Chandler denied Stimpson's involvement. Second, the circuit court determined that Cash's testimony did not constitute newly discovered material facts, entitling Stimpson to relief under state law, because he knew of those facts in time to file a post-trial motion. The circuit court also considered Cash's testimony impeachment evidence. Third, the circuit court dismissed Stimpson's claim regarding newly discovered material facts in the amended ballistics report. The amended report, according to the circuit court, was

consistent with Chandler's testimony. The original report was favorable to Stimpson because it contradicted Chandler's testimony and was available to him at the time of trial. And those facts did not entitle him to relief because the second report would not have "altered the result of the defendant's trial or established defendant's innocence."

Following this petition, Stimpson continued to appeal and file additional state petitions. The state courts denied his requests.

Stimpson then filed a federal habeas petition in the Northern District of Alabama. In that petition, he asserted various ineffective assistance of counsel claims that he alleged entitled him to federal habeas relief. Also in this petition, he offered five pieces of evidence that he alleged established his innocence: (1) Cash's testimony that Chandler told him a "Mexican" paid him to kill Ms. Gilbert; (2) Bone's testimony that Chandler lied about Stimpson's involvement; (3) medical records including Ms. Gilbert's statements after the shooting; (4) the "original" ballistics report; and (5) the "amended" ballistics report.

The district court determined that Stimpson failed to file his petition within the one-year statute of limitations required by the federal habeas statute. And the district court did not excuse this untimely filing because Stimpson's evidence did not establish his actual innocence. The district court explained that, although Cash's and Bone's statements impeached Chandler's testimony, they did not demonstrate Stimpson's actual innocence. The district court also rejected the ballistic evidence report as insufficient to establish

actual innocence. And, as to the medical records, the district court considered them "not new evidence because Stimpson's defense counsel stipulated to the admission of the victim's medical records" and "Stimpson acknowledges the medical records were part of the court record." Stimpson timely appealed.

This Court granted a certificate of appealability on one question: whether the district court erred by finding that the evidence submitted by Stimpson did not establish his actual innocence to excuse him from the statute of limitations for filing his federal habeas petition.

## II.

We review a district court's dismissal of a petition for a writ of habeas corpus *de novo*—including determinations that the petition is time-barred. *See San Martin v. McNeil*, 633 F.3d 1257, 1265 (11th Cir. 2011). The Antiterrorism and Effective Death Penalty Act of 1996 establishes a one-year statute of limitations for federal habeas petitions that begins to run on the latest of four triggering dates. 28 U.S.C. §§ 2244(d)(1)(A)–(D).

But the Supreme Court has recognized that a petitioner may "overcome" the Act's "one-year statute of limitations" period based on "a convincing showing of actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 386, 392 (2013). Demonstrating actual innocence "may allow a prisoner to pursue his constitutional claims (here, ineffective assistance of counsel) on the merits notwithstanding the existence of a procedural bar to relief." *Id*. at 392. To establish actual innocence, a petitioner must "persuade[] the district

court that, in light of the new evidence, no juror, acting reasonably, would have voted to find the petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

### III.

Stimpson makes two arguments on appeal. First, he contends that the district court applied the wrong legal standard when assessing Stimpson's actual innocence gateway claim. Second, he argues that new evidence establishes his actual innocence. We address each argument in turn.

### A.

We start with the legal standard for actual innocence claims based on new evidence. In establishing an actual innocence exception to procedural default, the Supreme Court explained that "new evidence" of actual innocence includes "evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Schlup*, 513 U.S. at 328 (quoting Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 160 (1970)). The Court also observed that "[t]o be credible" an innocence claim must be based on "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. When the Court extended this "actual innocence" exception to the statute of limitations, it likewise referenced "new evidence." *McQuiggin*, 569 U.S. at 386.

Our sister circuits have split on the kind of "new evidence" that a petitioner must introduce to establish actual innocence. One approach requires a petitioner to submit evidence that "was 'not available at trial and could not have been discovered earlier through the exercise of due diligence.'" *Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005) (quoting *Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001), *cert. denied*, 534 U.S. 963 (2001)). Another approach removes that diligence requirement and considers evidence that was not presented at trial "new," regardless of whether that evidence could have been discovered earlier. *See Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003).

The choice between these rules matters here because Stimpson's attorney knew of, but simply chose not to present, two pieces of evidence during the trial: the ballistics report and the medical report. Stimpson argues that we should adopt the more expansive view of "new" evidence, which would allow him to establish actual innocence based on any evidence that was not presented at trial, including these two reports. The state disagrees and argues that we should not consider any evidence as part of the actual innocence analysis if it was available at trial.

Ultimately, we need not decide this issue to resolve Stimpson's appeal. Instead, we will assume without deciding that Stimpson is correct that we can consider all evidence, available and unavailable at trial, in assessing whether he has established actual innocence. The problem for Stimpson is that, even considering all

the evidence he has submitted, we cannot say he has established actual innocence to avoid the statute of limitations.

B.

We will now address whether Stimpson established his actual innocence. We ask whether the evidence demonstrates "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). A petitioner may demonstrate factual innocence by presenting evidence that directly absolves him of involvement in the crime. The petitioner could meet this standard "where the [s]tate has convicted the wrong person of the crime." *See Sawyer v. Whitley*, 505 U.S. 333, 340 (1992). But evidence of actual innocence may also cast doubt on the "legal sufficiency" of the state's case. It may not directly absolve the petitioner of involvement in a crime, but it may lessen the probative force of the state's case to the point where a reasonable jury could not have convicted the petitioner.

Evidence that undermines the credibility of a witness will "seldom, if ever" satisfy this standard. *Id.* at 349. The Supreme Court has observed, for impeachment evidence to have altered the trial, "we should have to assume, first, that there was little evidence of [the crime] apart from the [witness's] testimony; and second, the jury accepted the [witness's] testimony without reservation." *Calderon v. Thompson*, , 563 (1998).

Stimpson contends that he satisfies the *Schlup* standard because his evidence casts the state's theory of Ms. Gilbert's shooting into "evidentiary disarray." Taking this concept from *House v. Bell*,

Stimpson argues that the new evidence "prevent[s] reasonable jurors from placing significant reliance on the [state's] evidence." 547 U.S. 518, 547 (2006). He contends, in particular, that the new evidence creates reasonable doubt about the type of gun used and the number of shooters involved. We disagree. Stimpson cannot establish that the jury accepted Chandler's testimony without reservation such that the new evidence would have altered a reasonable juror's perception of his testimony.

We will start with the jailhouse informant testimony. Stimpson submitted jailhouse informant statements from Bone and Cash suggesting that the shooter Chandler lied about Stimpson's involvement. Bone testified that Chandler told him, "I didn't shoot [Ms. Gilbert], I just drove" and "[t]he Mexican done the shooting." He further testified that Chandler felt bad about Stimpson's sentence, but Chandler lied to shorten his own sentence. For his part, Cash said that Chandler told him that "he was going to say what it took for him to get out of jail." And Cash testified that Chandler first told him that "[Stimpson] tried to get [Chandler] to do it" but "[t]hen [Chandler] come back and told me that there's two Mexicans that had furnished the gun, furnished the money, some money, and some drugs" to "shoot the lady." In Cash's affidavit he said that Chandler feared "Mexican drug dealers killing him."

Cash's and Bone's statements are cumulative impeachment evidence. The jury heard testimony from three witnesses, Eric Carroll, Mike Stimpson, and Tom Stimpson, that Chandler told them that an unnamed "Mexican" hired him to shoot Ms. Gilbert. That

evidence "already contradicts" Chandler's testimony that Stimpson hired him. *See Rozelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1019 (11th Cir. 2012). The jury had reason to doubt Chandler's credibility during the trial for exactly the same reasons that these new witnesses would have given. Thus, we find no reason to believe that these statements would have a "likely effect on reasonable jurors applying the reasonable-doubt standard." *House*, 547 U.S. at 539.

The medical report also—at most—impeaches Ms. Gilbert's testimony. Scientific evidence "is less susceptible to manipulation and, therefore, is appropriately considered reliable evidence despite [a] time lapse." *Floyd v. Vannoy*, 894 F.3d 143, 156 (5th Cir. 2018). But that's not the evidence Stimpson presents. Stimpson relies on the medical report, not as scientific evidence, but for a hearsay statement that contradicts Ms. Gilbert's testimony, and a notation of the number of bullets removed from Ms. Gilbert's body that contradicts Chandler's testimony. *Compare House*, 547 U.S. at 542 (a doctor testified that blood on the victim's clothing "was chemically too degraded, and too similar to blood collected during the autopsy," indicating that the blood spilled from autopsy samples), *with Calderon*, 523 U.S. at 563 (law enforcement officials' statements that a jailhouse informant, who previously testified at trial against the petitioner, was an unreliable witness).

In considering the probative value of this medical report, we note that Stimpson's defense counsel questioned Ms. Gilbert about the statement in the report. Specifically, that report says that Ms. Gilbert blamed her husband, Mr. Gilbert—not Chandler—

moments after the shooting. Although he solicited that supposed inconsistency in Ms. Gilbert's testimony, Stimpson's attorney chose not to introduce the medical report as an exhibit. But the jury already knew that Ms. Gilbert's statements following the shooting, and then, at trial, were inconsistent.

Stimpson also argues that the ballistics evidence and the medical report undermine the state's theory as to the number of shooters involved and gun used. But again, we disagree. He directs this Court to consider the differences between the "original" ballistics report and the "amended" ballistics report. The state introduced neither report during the trial, but Chandler testified that Stimpson gave him a .38 revolver to shoot Ms. Gilbert. Stimpson argues that these unintroduced reports—the medical report and two ballistics reports—undermine the state's theory that Chandler shot Ms. Gilbert with a .38 revolver.

The postconviction state court held an evidentiary hearing about the inconsistencies in the original and amended ballistics reports. Stimpson's expert witness testified that "in all my times working with guns, I've never seen a .9-millimeter revolver," which, in his opinion, made the original report's findings seem "odd." He added that a revolver-type gun and a 9mm-type gun are two distinct types of guns. The state's witness agreed that the initial report, which notes that someone likely fired the bullets from a 9mm gun, contradicts testimony that Chandler used a .38 revolver. And he observed that the evidence at trial was more consistent with a .38 revolver, which was the finding of the amended ballistics

report and consistent with Chandler's testimony. This evidence may have impeached Chandler's testimony about the type of gun, a .38 revolver, that he used to shoot Ms. Gilbert. But the type of gun Chandler used is not directly relevant to whether Stimpson hired Chandler to perform the shooting.

We cannot say that the jury accepted the testimony of Ms. Gilbert and Chandler without reservations. And Stimpson's new evidence, ultimately, results in cumulative impeachment evidence of those same two witnesses.

We also note that the state presented evidence in addition to the two impeached witnesses. For example, Todd Graves testified that Stimpson said that someone could make money "by being a hit man or whacking somebody" and that Stimpson knew someone "who needed to be whacked" and would give "$15,000" to the person who did it. The evidence also does not address Chief Ransum's testimony that Stimpson initially denied involvement in the shooting, but then, one day later, asked Chief Ransum for a deal. And as to the motive, the jury heard that Stimpson and Mr. Gilbert knew one another for years, and that Mr. Gilbert and Ms. Gilbert sought a divorce, which resulted in substantial assets at stake. In light of this evidence, we cannot say that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329.

Collectively, Stimpson's evidence challenges the legal sufficiency of his conviction—but does not establish his factual innocence. *See Bousley,* 523 U.S. at 623. Satisfying the actual innocence

standard requires that the petitioner do "more than counterbalance the evidence that sustained the petitioner's conviction." *Rozelle*, 672 F.3d at 1016–17. Because the new evidence is cumulative of impeachment evidence for two of the state's witnesses, Stimpson fails to demonstrate actual innocence. Without this showing, we cannot excuse the fact that he filed his habeas petition outside the statute of limitations period. His petition is therefore untimely. *See* 28 U.S.C. § 2244(d).

## IV.

We **AFFIRM** the district court.