**Daniel LARSEN, Petitioner,**

v.

**Derral G. ADAMS, Warden, Respondent.**

**No. CV 08–04610 CAS (SS).**

United States District Court, C.D. California.

Aug. 7, 2009.

Alexander James Simpson, Jan Stiglitz, Justin Brooks, California Western Law School, California Innocence Project, San Diego, CA, for Petitioner.

Eric J. Kohm, CAAG—Office of Attorney General of California, Los Angeles, CA, for Respondent.

## ORDER ADOPTING FINDINGS, CONCLUSIONS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

CHRISTINA A. SNYDER, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the First Amended Petition, the Motion to Dismiss, all of the records and files herein, the Magistrate Judge's Report and Recommendation, Respondent's Objections and Petitioner's Response to Respondent's Objections. After making a *de novo* determination of the portions of the Report and Recommendation to which Objections were directed, the Court concurs with and adopts the findings, conclusions and recommendations of the Magistrate Judge.

Accordingly, IT IS ORDERED THAT:

1. The Motion to Dismiss is DENIED. Further proceedings regarding Petitioner's constitutional claims are required.

2. The Clerk shall serve copies of this Order on all counsel.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

SUZANNE H. SEGAL, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Christina A. Snyder, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California.

## I.

### INTRODUCTION

On July 15, 2008, Daniel Larsen ("Petitioner"), a California state prisoner represented by counsel, filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. The Court dismissed the Petition with Leave to Amend on August 7, 2008. On October 27, 2008, Petitioner filed a First Amended Petition for Writ of Habeas Corpus ("First Amended Petition" or "FAP"). In the First Amended Petition, Petitioner's sole ground for relief is that his June 23, 1999 conviction was unconstitutional because his trial counsel provided ineffective assistance by failing to locate, investigate, and bring to trial exculpatory witnesses and failing to present evidence of third-party culpability.[1] (FAP at 5).

On January 16, 2009, Respondent moved to dismiss this Petition ("Motion") and lodged several documents with the Court.[2] In the Motion, Respondent argues that the Petition is untimely. (Motion at 4). Petitioner opposed the Motion ("Opposition") on February 19, 2009. In the Opposition, Petitioner argues that by making a "colorable showing of factual innocence," he should be allowed to present his otherwise time-barred constitutional claim to the Court. (Opposition at 3). On May 19, 2009, the Court held an evidentiary hearing to determine whether evidence supported Petitioner's claim of actual innocence to allow the Court to consider the merits of the Petition.

Based upon the First Amended Petition, the pleadings, the lodgments, and the testimony presented at the evidentiary hearing, the Court finds that Petitioner satisfies the "actual innocence" gateway set forth in *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Furthermore, the Court finds that the federal statute of limitations does not bar the Petition. Respondent's Motion to Dismiss should therefore be DENIED. Additional proceedings are required to decide Petitioner's constitutional claim of ineffective assistance of counsel.

## II.

### PRIOR PROCEEDINGS

Petitioner was charged with possession of a dagger, in violation of California Penal Code ("Penal Code") section 12020(a). (CT 34). The prosecution chose to charge this violation as a felony.[3] (*Id.*). Petition-

---

1. Petitioner states six contentions in support of his ineffective assistance claim. He asserts that his trial counsel, Michael Consiglio, (1) failed to conduct a proper pretrial investigation and thereby failed to locate or interview eyewitnesses; (2) failed to respond to Petitioner's request that a percipient witness, James McNutt, be called; (3) failed to respond to a potential witness, Jorji Owen, who informed trial counsel of her knowledge of the incident; (4) failed to offer any testimony in Petitioner's defense; (5) failed to offer evidence of third party culpability; and (6) failed to make a motion for a new trial when Petitioner requested the motion and provided counsel with contact information for witnesses. In his First Amended Petition, Petitioner describes his trial counsel's extensive record of professional misconduct. While a member of the bar, trial counsel received ten periods of discipline by the State Bar. (FAP at 9). Petitioner's trial counsel was disbarred on May 4, 2008. (*Id.*).

2. These Lodgments include the Clerk's Transcript ("CT") and a two volume Reporter's Transcript ("RT").

3. Possession of a dagger can be charged either as a misdemeanor or as a felony. Penal Code section 12020(a) ("Any person in this state who does any of the following is punishable by imprisonment in a county jail not exceeding one year or in the state prison."). *See also People v. Plumlee,* 166 Cal.App.4th 935, 938, 83 Cal.Rptr.3d 172 (2008)(recognizing that possession of a dagger is a "wobbler," i.e., it may be charged as a misdemeanor or a felony).

er pled not guilty. (CT 37). On June 23, 1999, a Los Angeles Superior Court jury found Petitioner guilty. (CT 92). Petitioner admitted to three prior felony convictions. (CT 88).[4] Because of these prior convictions, the trial court sentenced Petitioner to twenty-eight years to life imprisonment, pursuant to Penal Code sections 667(b)-(I), 1170.12(a)-(d), and 667.5(b). (CT 91).

Petitioner appealed his conviction. On June 1, 2000, the California Court of Appeal affirmed the trial court's judgment. (Lodgment 2). The California Supreme Court subsequently denied review on August 9, 2000. *See* California Appellate Courts Case Information, http://appellatecases.courtinfo.ca.gov (case number S089656). Petitioner did not raise his ineffective assistance of counsel claim on direct appeal.[5] (*See* FAP 2–3).

On May 18, 2005, Petitioner raised his ineffective assistance of counsel claim for the first time when he filed a state habeas petition in the Los Angeles County Superior Court.[6] (Lodgment 4; *see also* FAP Exh. T). The Superior Court denied this petition on May 19, 2005, holding that there was "insufficient evidence alleged that trial counsel failed to act in a manner of a reasonably competent attorney."

(FAP Exh. N). Petitioner then filed a habeas petition in the California Court of Appeal on February 27, 2006. (Lodgment 5; FAP Memo. at 6). That court denied the petition on March 28, 2006. (FAP Exh. M). Petitioner then filed a petition in the California Supreme Court on May 31, 2006. (Motion at 3; FAP Memo. at 6). In response to an order by the supreme court, Respondent filed an "informal response" to the petition, (Lodgment 7), and Petitioner filed an "informal reply." (Lodgment 8). The supreme court denied the petition without comment on July 25, 2007. (FAP Exh. Q). Petitioner filed his federal Petition on July 15, 2008, arguing his trial counsel was ineffective for several reasons, including failing to locate, investigate, and bring to trial exculpatory witnesses and failing to present evidence of third-party culpability.

## III.

### DISCUSSION

#### A. *AEDPA's Limitations Period Governs The Petition*

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), which effected amendments to the federal habeas stat-

---

**4.** Petitioner was convicted in 1987 and 1989 of burglary, in violation of Penal Code section 459, and in 1993 of possession of a deadly weapon, in violation of Penal Code section 12020(a). (*See* CT 35, 88).

**5.** On direct appeal to both the California Court of Appeal and the California Supreme Court, Petitioner raised three claims:

(1) "The trial court erred in excluding evidence, relevant to the credibility of officer Townsend, that the original case against [Petitioner] had been dismissed because no evidence was presented that the alleged dagger was concealed."

(2) "The trial court erred in admitting evidence that [Petitioner] gave a false name on arrest and instructing that such evidence

could be construed as consciousness of guilt."

(3) "[Petitioner's] punishment is so grossly disproportionate to the conduct for which it is imposed that it shocks the conscience and offends fundamental notions of human decency."

(FAP at 2–3).

**6.** In his 2005 petition to the superior court, Petitioner argued that his trial counsel was deficient for failing to investigate and call several potentially exculpatory witnesses. (*See* FAP Exh. T at 276–78). Petitioner also argued that his trial counsel provided ineffective assistance when he failed to request that the dagger be fingerprinted and when he failed to raise a defense of third-party culpability. (*See* FAP Exh. T at 278–80).

utes, applies to the instant Petition because Petitioner filed it after AEDPA's effective date of April 24, 1996. *Lindh v. Murphy,* 521 U.S. 320, 322–23, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). AEDPA dramatically altered federal habeas litigation by imposing a specific time limit on the filing of federal habeas petitions. *Rhines v. Weber,* 544 U.S. 269, 274, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005). By creating a limitations period, Congress intended "to reduce delays in the execution of state and federal criminal sentences." *Woodford v. Garceau,* 538 U.S. 202, 206, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003).

A one-year limitations period runs from the latest of the following dates:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). In this action, section 2244(d)(1)(A) governs. The federal statute of limitations began to run on November 8, 2000, the day after the judgment became final.

■ AEDPA provides a tolling provision which suspends the limitations period for the time during which a "properly filed" application for post-conviction or other collateral review is pending in state court. 28 U.S.C. § 2244(d)(2); *Pace v. DiGuglielmo,* 544 U.S. 408, 410, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005). In addition, equitable tolling may be available if the petitioner demonstrates he has pursued his rights diligently and an extraordinary circumstance prevented him from filing his petition. *See Waldron–Ramsey v. Pacholke,* 556 F.3d 1008, 1013 (9th Cir.2009); *see also Harris v. Carter,* 515 F.3d 1051, 1054 (9th Cir.2008) (equitable tolling requires petitioner to demonstrate an "extraordinary circumstance" prevented him from filing).

**B.** *Petitioner Did Not File His Petition Within The Limitations Period*

Petitioner's conviction became final on November 7, 2000, ninety days after the California Supreme Court denied review, because Petitioner did not appeal to the United States Supreme Court. *See Bowen v. Roe,* 188 F.3d 1157, 1158–59 (9th Cir.1999)(holding that the period of direct review for the purposes of AEDPA's limitation period "includes the period within which a petitioner can file a petition for writ of certiorari from the United States Supreme Court"); *see also* Sup.Ct. R. 13 (allowing a petition for writ of certiorari to be filed within ninety days after the entry of judgment by state supreme court). The statute of limitations began running on the next day, pursuant to 28 U.S.C. § 2244(d)(1)(A), and the limitations period ended on November 8, 2001.

Petitioner asserts that he did not want to file a habeas petition without assistance because he was not familiar with the law. (FAP, Exh. E at 2). Starting in October of 1999, Petitioner contacted numerous attorneys and legal aid organizations, seeking assistance with his habeas petitions

and with proving his innocence. (*See* FAP, Exh. E at 2–3). Petitioner was unable to find assistance until the California Innocence Project became interested in his case. (*See* FAP, Exh. E at 3).

▉ Petitioner's lack of familiarity with the law does not warrant tolling AEDPA's statute of limitations. *Rasberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir.2006). Notwithstanding Petitioner's diligence in seeking assistance, because Petitioner did not file his first state habeas petition until May 18, 2005, statutory tolling is not available. *See Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir.2003) (holding that 28 U.S.C. § 2244(d) does not permit "reinitiation of the limitations period that has ended before the state petition was filed"). Absent any other tolling or excuse from AEDPA's statute of limitations, the Petition was untimely by 2,441 days.

## C. *A Credible Actual Innocence Claim May Allow Consideration Of An Untimely Constitutional Claim On The Merits*

▉ The Supreme Court has held that a habeas petitioner's sufficient showing of innocence can overcome a procedural bar. In *Schlup*, the Court considered a successive habeas petition arguing that a constitutional error at trial deprived the jury from considering evidence that would have established the petitioner's innocence. *Schlup*, 513 U.S. at 301, 115 S.Ct. 851. The Court found that this claim was "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315, 115 S.Ct. 851 (quoting *Herrera v. Collins*, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)). It ultimately held that:

> if a petitioner ... presents evidence of innocence so strong that a court cannot have confidence in the outcome of the

trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

*Id.* at 316, 115 S.Ct. 851.

Passing through the *Schlup* gateway does not, by itself, provide a basis for relief. *Id.* at 315, 115 S.Ct. 851. In the instant case, any relief from his sentence that Petitioner might ultimately receive would flow from his ineffective assistance of counsel claim. Because of this, the Supreme Court distinguished the *Schlup* gateway from the actual innocence standard defined by *Herrera*, which required an "extraordinarily high" standard of review but would allow for immediate relief. *Id.* at 315–16, 115 S.Ct. 851; *see also Herrera*, 506 U.S. at 417, 113 S.Ct. 853 (assuming that proof of actual innocence would warrant federal habeas relief).

▉ To pass through the *Schlup* gateway, Petitioner must "demonstrate that more likely than not, in light of [new evidence presented to the Court], no reasonable juror would find him guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). The Ninth Circuit has further clarified this standard, holding that "[a] petitioner need not show that he is actually innocent of the crime he was convicted of committing; instead, he must show that a court cannot have confidence in the outcome of his trial." *Majoy v. Roe*, 296 F.3d 770, 776 (9th Cir.2002). More recently, although continuing to uphold the *Schlup* standard, the Ninth Circuit held that "the miscarriage of justice exception is limited to those *extraordinary* cases where the petitioner asserts his innocence and establishes that the court cannot have confidence in the contrary finding of guilt." *Johnson v. Knowles*, 541 F.3d 933, 937 (9th

Cir.2008) (emphasis in original). In *Johnson*, the Ninth Circuit denied relief to a petitioner who "expressly *concede[d]* his guilt." *Id.* at 936 (emphasis in original). In the First Amended Petition, Petitioner contends that he is, in fact, actually innocent. (*See, e.g.*, FAP Memo. at 47). As discussed below, Petitioner has established that this Court cannot have confidence in his conviction. Petitioner has satisfied the requirements to pass through the *Schlup* gateway.

### D. *As Petitioner Has Satisfied The Schlup Standard, The AEDPA Statute Of Limitations Does Not Bar Relief*

The Ninth Circuit has not directly addressed whether a court may consider the merits of a time-barred petition if a petitioner meets the *Schlup* gateway standard. In *Majoy*, the petitioner's federal habeas petition was untimely, but he argued that the *Schlup* gateway should be available to him to overcome this defect. *Majoy*, 296 F.3d at 772–73. No evidentiary hearing was held, however, so the petitioner's claims of innocence were not fully developed. Nonetheless, the court of appeals found that, given the proffered evidence of the petitioner's innocence, Majoy's case "might fall within the narrow class of cases implicating a fundamental miscarriage of justice." *Id.* at 776. Although the court noted that "the question to be answered is whether surviving the rigors of [the *Schlup*] gateway has the consequence of overriding AEDPA's one-year statute of limitations," *id.*, it ultimately found that it could not address the issue "unless and until [the petitioner] establishes under examination and adversarial testing to the satisfaction of the appropriate factfinder that [he has met the *Schlup* standard]." *Id.* at 777.

Although the *Majoy* panel declined to decide the issue, *Majoy* cited to numerous other decisions which found that preventing a petitioner who demonstrated his innocence from pursuing habeas relief would raise "serious constitutional questions" and "would likely constitute a due process violation or an improper suspension of habeas corpus relief." *Id.* at 776–77 (citing to decisions by the Second, Third, and Tenth Circuits, as well as the Central District of California and the Southern District of New York). Ultimately, the court remanded *Majoy* to the district court for a determination of whether the petitioner met the *Schlup* standard. *Id.* at 777–78.

Although the Ninth Circuit has not explicitly decided whether a claim of innocence can excuse an untimely habeas petition, other circuits have. In *McCray v. Vasbinder*, 499 F.3d 568 (6th Cir.2007), the Sixth Circuit rejected a petitioner's untimely petition because he had not met the *Schlup* standard. *McCray*, 499 F.3d at 569. Nonetheless, the court noted that "[o]ne form of equitable tolling [it has] recognized is a claim of 'actual innocence.' " *Id.* at 571. Similarly, the Tenth Circuit has stated that "[e]quitable tolling would be appropriate … when a prisoner is actually innocent." *Burger v. Scott*, 317 F.3d 1133, 1141 (10th Cir.2003).

Other circuits have declined to address the question of whether an innocence claim will excuse an untimely petition. In *Doe v. Menefee*, 391 F.3d 147 (2nd Cir.2004), the Second Circuit rejected the district court's finding that AEDPA's statute of limitations should be tolled. *Doe*, 391 F.3d at 173. However, the court reversed the district court's decision because the petitioner had not made a credible showing of actual innocence, not because it found that an actual innocence claim could not establish tolling. *Id.* at 174. Like the Ninth Circuit, the court declined to consider the existence of an actual innocence exception to AEDPA's statute of limitations until that issue was squarely presented. *Id.*

Similarly, the Eleventh Circuit has avoided the constitutional issue "because no time-barred petitioner has made the requisite actual-innocence showing." *Johnson v. Fla. Dep't of Corr.,* 513 F.3d 1328, 1333 (11th Cir.2008).

A minority of circuits have found that an untimely petition could be barred by AEDPA even if the petitioner makes a showing of innocence. In *David v. Hall,* 318 F.3d 343 (1st Cir.2003), the First Circuit found that the petitioner had not met the *Schlup* standard, *David,* 318 F.3d at 348, but also noted that when Congress drafted AEDPA, it could have but did not include a "statutory exception for actual innocence." *Id.* at 347. Similarly, the Seventh Circuit has held that "[p]risoners claiming to be innocent ... must meet the statutory requirement of timely action." *Araujo v. Chandler,* 435 F.3d 678, 680 (7th Cir.2005).

The Eighth Circuit has also rejected a claim that innocence should toll AEDPA's statute of limitations, finding that to do otherwise "would take the equitable-tolling doctrine far from its original and legitimate rationale." *Flanders v. Graves,* 299 F.3d 974, 977 (8th Cir.2002). The *Flanders* court did not discuss the strength of the petitioner's innocence claims. Finally, the Fifth Circuit considered tolling for innocence claims in *Felder v. Johnson,* 204 F.3d 168 (5th Cir.2000). The court refused to grant tolling for the petitioner's *claim* of innocence, but noted that the petitioner "ha[d] not made a *showing* of actual innocence." *Felder,* 204 F.3d at 171, n. 8. Because many petitioners claim innocence, "claiming" innocence does not constitute a "rare and exceptional" circumstance. *Id.* The *Felder* court distinguished between "claims" and "showings" of actual innocence, but did not discuss how it would ultimately treat them differently.

The Ninth Circuit avoided the actual innocence issue in *Majoy* because it found that the issue was not squarely before it. However, the issue was directly before the district court in *Lisker v. Knowles,* 463 F.Supp.2d 1008 (C.D.Cal.2006). In *Lisker,* the petitioner, convicted of murdering his mother, asserted a credible actual innocence claim. The court observed: "In order to avoid the clear constitutional issues, because the fact that equity can toll a limitations period is well-accepted, and because the *Schlup* miscarriage of justice concept is a well-established equitable doctrine, the Court concludes that AEDPA's statute of limitations must be tolled when an evidentiary showing demonstrates that its application would work a miscarriage of justice under *Schlup.*" *Lisker,* 463 F.Supp.2d at 1038.

This Court, following the *Schlup* rationale, the holdings of the Sixth and Tenth Circuits, and the district court's reasoning in *Lisker,* finds that a credible actual innocence claim overcomes the statute of limitations bar. In *Schlup,* the Supreme Court recognized that "[t]he quintessential miscarriage of justice is the execution of a person who is actually innocent." *Schlup,* 513 U.S. at 324–25, 115 S.Ct. 851. The need to avoid such a miscarriage of justice outweighed "the societal interests in finality, comity, and conservation of scarce judicial resources." [7] *Id.* at 324, 115 S.Ct. 851. Although Petitioner does not face execution if the Court refuses to consider the merits of his Petition, he will possibly spend the rest of his life in prison. Such a sentence would represent a miscarriage of justice if it were imposed on an innocent man. The Court concludes that there must be an exception to AEDPA's statute of limitations when a petitioner makes a

---

**7.** Relief under *Schlup* is not limited to capital petitioners. In *Johnson,* the Ninth Circuit applied the *Schlup* standard to a petitioner sentenced to approximately seventeen years imprisonment. *Johnson,* 541 F.3d at 934.

sufficient showing of his innocence to pass through the *Schlup* gateway. As is discussed below, Petitioner here has made a sufficient showing. The AEDPA statute of limitations, therefore, does not bar this action.

### E. *Evidence Of Actual Innocence*

#### 1. Trial Evidence

Petitioner did not present a defense at trial. (2 RT 262). The prosecution called three witnesses. Police officers Thomas Townsend and Michael Rex were percipient witnesses to the events leading up to Petitioner's arrest. Detective Kenneth Crocker testified about events after Petitioner was booked at the police station.

##### a. Officer Thomas Townsend's Testimony

Thomas Townsend is a Los Angeles Police Department officer. (1 RT 36). Around one a.m. on June 6, 1998, he received a call pertaining to the Gold Apple bar. (1 RT 36–37). His partner at the time was Mike Rex. (*Id.*). The call reported an assault with a deadly weapon in progress, with shots fired. (1 RT 37). The call described the suspect, who reportedly had a gun, as wearing a green flannel shirt and having a long ponytail. (*Id.*). In court, Townsend identified Petitioner as the man wearing a green flannel shirt that night. (1 RT 46).[8] Townsend testified that he was driving the car and that because the call was "Code Three," he had on his flashing lights and siren. (1 RT 38). As Townsend approached the scene, he turned off his lights and siren so as not to alert people of his arrival. (1 RT 39).

When Townsend arrived at the scene, business signs and overhead lights lit the bar's parking lot. (1 RT 41). Townsend then turned on the roof-mounted floodlights on his car, as well as the car's side spotlights and high beams. (*Id.*). Townsend could not remember if there was enough light to see Petitioner before he turned on his car's lights. (*Id.*).

Townsend saw Petitioner standing in the parking lot, facing the police car. (1 RT 42). A chain-link fence separated Petitioner from Townsend. (*See* 1 RT 54; Evidentiary Hearing Exh. 105). Townsend was approximately twenty-two feet away from Petitioner. (1 RT 82–83). Townsend testified that he could see Petitioner's entire body, but he focused on Petitioner's hands, looking for a weapon. (1 RT 43–44). Because Townsend thought that Petitioner might have a weapon, he had "tunnel vision" on Petitioner. (1 RT 44). Townsend testified that "to distract [his] tunnel vision [he] still attempted to look around the area." (*Id.*).

While Townsend was still in the police car, he saw Petitioner crouch down, reach into the waistband of his pants and pull out an object. (1 RT 48, 50). Townsend described this object as "linear . . . possibly five or six inches long." (1 RT 51). However, Townsend admitted that he "couldn't tell what it was that he was grasping." (RT 49–50). After pulling this object out of his pants, Townsend testified that Petitioner threw it underneath a car to his left. (1 RT 50). Petitioner was facing Townsend as he threw the object, and Townsend could see both the entire throwing motion and the area where the object landed. (1 RT 52). As Petitioner threw the object, he was lit by the parking lot lights and by the lights on Townsend's car. (1 RT 48). At

---

8. Officer Townsend admitted that Petitioner did not have a gun. Furthermore, according to Townsend and to Elinore McNutt, a percipient witness at the evidentiary hearing, Petitioner had short hair on the night of his arrest, not a ponytail. (*See* 1 RT 46; 102; Evidentiary Hearing Transcript ("EHT") at 50). The original description of the suspect stated that he had a "long ponytail." (RT 37).

the time, Townsend and Rex were the only police officers at the scene. (1 RT 59). Only later did other police units arrive, including a helicopter with a "Night Sun" spotlight. (1 RT 59–60).

Townsend remembered between ten and twenty people in the parking lot with Petitioner, standing between ten and thirty feet away from Petitioner. (1 RT 53). As Townsend exited the police car, he yelled at everyone to get down on their knees and put their hands on their heads. (1 RT 58). Townsend testified that after this "everybody was detained in handcuffs, most people were." (1 RT 61).

Townsend searched Petitioner. (1 RT 62). He did not find any kind of sheath for a knife on Petitioner. (*Id.*). After putting Petitioner in the back of a police car, Townsend went to look for the object Petitioner had thrown. (1 RT 62–63). Townsend picked up an object from underneath the pickup truck which was "a knife with a double-edged blade. It was a weighted handle and it had a finger guard for your hand." (1 RT 63).

Townsend searched the parking lot for other weapons. (1 RT 75–76). He found a three to four inch long copper bar wrapped with cloth tape. (1 RT 64). Townsend found this copper bar ten to thirty feet away from Petitioner in the opposite direction from where Townsend saw Petitioner throw the object. (1 RT 65). Townsend testified that he did not see Petitioner or anyone else throw the copper bar. (1 RT 70). He was sure that the copper bar was not the object he saw Petitioner pull out of his waistband. (1 RT 74).

On cross-examination, Townsend testified that the knife he recovered at the scene was "extremely sharp." (1 RT 92). Townsend took precautions against the knife cutting through the evidence bag by wrapping the blade in tape. (1 RT 91–92).

Townsend believed that the blade could easily "poke through skin." (1 RT 92).

Townsend admitted to several inconsistencies between his testimony at trial and at two preliminary hearings. In his arrest report, Townsend did not mention that the knife was concealed. (1 RT 87–88). Similarly, at a preliminary hearing on November 6, 1998, Townsend did not testify that the knife was concealed. (1 RT 88). The initial case against Petitioner was apparently dismissed for insufficient evidence of concealment, an element of the crime with which Petitioner was charged. (*See* FAP at 3; *see also* Penal Code section 12020(a)(4)). After the November 6, 1998 preliminary hearing, the prosecutor spoke with Townsend about the necessity for testimony about concealment. (1 RT 88). Then, at a preliminary hearing on February 23, 1998, Townsend testified for the first time that Petitioner's shirt covered the knife. (*Id.*).

At the November 6, 1998 preliminary hearing, Townsend testified that he was the passenger in the police car, not the driver. (1 RT 81). Townsend made numerous references to being a passenger and observing the scene through the passenger window. (*Id.*). At trial, Townsend attempted to explain this inconsistency. He testified that the passenger of the police car is responsible for the shotgun. (1 RT 141). Although Rex had the shotgun while Townsend picked up the knife, Townsend took the shotgun from him to return it to the police car. (1 RT 142). Townsend explained that because he remembered holding the shotgun at one point, he thought that he had been the passenger. (1 RT 141).

b. Officer Michael Rex's Testimony

Michael Rex is also a Los Angeles Police Department officer and was Townsend's partner on June 6, 1998. (1 RT 166–67). Rex testified that the call pertaining to the

Gold Apple bar stated that an assault with a deadly weapon was in progress. (1 RT 167). The call listed five males. (*Id.*). Of those five, only one had a particular description, which was a white male wearing a green flannel shirt and armed with a handgun. (*Id.*).

When Rex and Townsend arrived at the scene, Rex could see Petitioner lit by the business signs, the overhead parking lights, and the lights on the police car. (1 RT 170). Rex testified that he focused on Petitioner because he matched the particular description in the call.[9] (*Id.*). Specifically, he focused on Petitioner's hands and waist area. (*Id.*). There were two other men standing five to ten feet away from Petitioner. (1 RT 171).

On direct examination, Rex testified that as he and Townsend approached in the police car, Petitioner was facing them. (1 RT 173). On cross-examination, Rex testified that Petitioner was first facing away from the police car, then turned his entire body to face the car. (2 RT 209). Petitioner was standing approximately twenty feet away from the police car at the time and nothing obstructed Rex's view of him. (1 RT 177). Rex was the passenger in the police car and saw Petitioner through the passenger side of the windshield. (*Id.*). Two other males were standing with Petitioner. (RT 171). Rex thought it was odd that Petitioner was wearing a flannel shirt, because it was a warm night and no one else was wearing warm clothing. (1 RT 194).

As Petitioner faced the police car, Rex testified that he saw Petitioner reach into his waistband and pull out a shiny metal object. (1 RT 174). This object was five

to six inches long. (1 RT 175). According to Rex, after pulling the object from his waistband, Petitioner crouched down, bent at the knees, and threw the object under the car next to him. (*Id.*). When Rex got out of the car, he was ten feet away from the thrown object. (1 RT 180).

Rex testified that he was focused on covering Townsend with the shotgun and also focused on the object Petitioner had thrown. (1 RT 183). After Petitioner threw the object, no one else came near it. (1 RT 186). Rex was certain that the object Petitioner threw was not the copper bar Townsend found, because the bar was not as big as the object Rex saw and was not shiny. (1 RT 187).

Rex spoke to Petitioner at the scene. Petitioner said that his name was Anthony Vant. (1 RT 189–90). Rex strip searched Petitioner after taking him to jail. (1 RT 192). During the strip search, Rex did not find a sheath or any other protection for a knife, (2 RT 217), nor did he find any pull or tear marks on Petitioner's clothes. (2 RT 218).

c. Detective Kenneth Crocker's Testimony

Kenneth Crocker is a Los Angeles Police Department detective. (2 RT 233). After Petitioner's arrest, Crocker was in charge of filing the case with the District Attorney's office. (2 RT 234). While processing Petitioner's file, Crocker discovered that the fingerprints taken from Petitioner matched those associated with Daniel Larsen rather than Anthony Vant. (*Id.*) Crocker then compared the driver's license photos on file and found that Anthony Vant did not look like Petitioner. (2 RT 236).

**9.** Again, the Court notes that Petitioner did not exactly match the description of the suspect in the call. According to Townsend, Petitioner was wearing a green flannel shirt. (*See* 1 RT 41, 46). Rex did not testify to the color of Petitioner's shirt, but did state that the shirt was flannel. (*See, e.g.,* 1 RT 174). Rex testified that the suspect in the call was described as armed with a handgun. (*See* RT 167). However, Townsend confirmed that Petitioner did not have a gun.

Crocker also testified that he never requested an analysis of the fingerprints on the knife. (2 RT 239). Petitioner's trial counsel never requested a fingerprint analysis. (*Id.*). Even if some party had requested an analysis, because the knife "was handled by several different people before it got into evidence," Crocker thought that there would not be "a very good chance of getting any readable fingerprints off [the] knife." (2 RT 240). On cross-examination, Crocker admitted that "there are ways to pick up pieces of evidence that you are not going to contaminate it for fingerprints." (2 RT 241).

## 2. Evidence Presented At May 19, 2009 Evidentiary Hearing

This Court held an evidentiary hearing ("Hearing") on May 19, 2009. Petitioner was present, represented by Jan Stiglitz, Alexander Simpson, and Alissa Bjerkhoel of the California Innocence Project. Three witnesses testified on behalf of Petitioner, who also presented documentary evidence. Respondent did not call any witnesses.

### a. James McNutt's Testimony

James McNutt is currently a correctional officer in Tennessee. (EHT 16–17). He previously spent twenty-two years in the military, serving in combat in Vietnam and Grenada. (EHT 14). After leaving the military, Mr. McNutt spent eight years as a police officer in North Carolina, including time as a chief of police. (EHT 15–16).

On June 6, 1998, Mr. McNutt went to the Gold Apple bar with his wife to celebrate a birthday. (EHT 17). Mr. McNutt intended to meet his stepson, Daniel Harrison, at the bar. (EHT 18; FAP Memo. at 29). Mr. McNutt estimated that he arrived at the bar around 7:30 p.m., but stated that he was unsure of the time. (EHT 18). Mr. McNutt parked facing the bar. (*Id.*). Harrison was parked behind him and to the right. (*Id.*).

When Mr. McNutt exited his car, he heard a loud argument coming from near Harrison's car. (EHT 19). Mr. McNutt walked over to Harrison's car and stood by the front driver's side. (EHT 19–20; *see also* Hearing Exh. 21).[10] Two other people were standing near Harrison's car: Petitioner and a man known to Mr. McNutt as "Bunker." (EHT 20–21). Mr. McNutt was standing approximately two feet away from Bunker. (EHT 21). Bunker was standing next to the driver's door of Harrison's car. (*See* Hearing Exh. 21). Petitioner stood behind Bunker, closer to Harrison's taillights. (*Id.*). Mr. McNutt, Bunker, and Petitioner were in these same positions when Mr. McNutt became aware of the police. (EHT 22).

After Mr. McNutt walked to Harrison's car, he argued with Bunker for approximately two minutes. (*Id.*). Petitioner did not say anything while Mr. McNutt was there. (EHT 24). Petitioner stood with his hands at his sides, listening to Mr. McNutt and Bunker argue. (*Id.*). After arguing with Bunker for two minutes, Mr. McNutt heard someone yell "5–0." (EHT 22). Mr. McNutt took this to mean "police." (EHT 22–23). Mr. McNutt then saw twenty to twenty-five police officers arrive from all directions. (EHT 23).

Mr. McNutt was paying attention to Bunker because Bunker was hostile. (*Id.*). When the police arrived, "Bunker turned around, took a few steps ... [and] threw an item near the vehicle parked next to [Harrison's] vehicle." (*Id.*). Mr. McNutt

---

10. Hearing Exhibit 21 is a diagram drawn by Mr. McNutt during his testimony. Petitioner's counsel initially marked it "Hearing Exhibit 6". (EHT 44). However, an Exhibit 6 already existed on Petitioner's exhibit list. (EHT 45). Petitioner's exhibit list had twenty items on it, so when the diagram was admitted, the Court admitted it as "Hearing Exhibit 21." (*EHT 45–46*).

did not see the object when it was in Bunker's hand, but heard it hit the ground. (*Id.*). The object sounded metallic, and Mr. McNutt believes that it was "probably" a knife. (*Id.*). Based on his professional experience, Mr. McNutt testified that the object was not a handgun. (*Id.*). Mr. McNutt also testified that a copper weight would not have made the noise he heard. (EHT 32). After Bunker threw the object, Mr. McNutt saw it under the vehicle. (EHT 23). It appeared to be ten or twelve inches long. (EHT 32).

When the police arrived, Mr. McNutt, Petitioner, and Bunker walked away from Harrison's car, toward the bar. (EHT 24; *see also* Hearing Exh. 21). Mr. McNutt, who was wearing a Pittsburgh Steelers jacket because the night was cool, heard: "You in the fucking Pittsburgh Steelers ... freeze." (EHT 25). Two police officers handcuffed Mr. McNutt. (*Id.*). One of the police officers frisked Mr. McNutt, and in the process "massaged" Mr. McNutt's penis "for about five, six seconds." (*Id.*). An officer then searched Mr. McNutt's wallet, finding cards identifying Mr. McNutt as a former police officer and chief of police. (*Id.*). The officers then opened Mr. McNutt's handcuffs and told him to leave. (*Id.*). Mr. McNutt asked the officers what they were looking for and was told: "a black man with a gun." (*Id.*). The officers never interviewed Mr. McNutt about what he had seen. (EHT 25–26). Mr. McNutt never went into the Gold Apple bar that night. (EHT 30).

On cross-examination, Mr. McNutt testified that although he remembers lights in the parking lot and red and blue flashing lights on the police cars, he does not remember whether the police cars had their spotlights or headlights on. (EHT 28). Mr. McNutt neither saw nor heard a police helicopter. (EHT 28–29). Mr. McNutt testified that he was "a nervous wreck" after the incident. (EHT 34). He felt that the officers he encountered were extremely rude and rough. (*Id.*). However, he thought that the police officers treated his wife appropriately. (EHT 36). Mr. McNutt never complained to either the Los Angeles Police Department watch commander or the United States Attorney about the officers' conduct. (EHT 35, 37).

Although Mr. McNutt saw police arrest Petitioner, Mr. McNutt did not tell any of the police officers that he had been a witness. (EHT 44). The police ordered Mr. McNutt to leave and did not give him a chance to make a statement. (*Id.*). Mr. McNutt did not make a statement concerning his recollection of Petitioner's arrest until two years after the incident. (EHT 41).

Mr. McNutt made an initial statement with Mrs. McNutt on September 21, 2001, and a declaration of his own on July 21, 2005. (*See* FAP Exh. B).[11] The testimony in the statement and the declaration was virtually identical to Mr. McNutt's testimony at the evidentiary hearing.[12] Mr. McNutt did not review any of these docu-

---

11. Petitioner declares that he learned of the McNutts' potential testimony after his conviction but before he was sentenced. (FAP Exh. E at 1). Bridgette Timcho, a friend of Petitioner's, states in a declaration that she located the McNutts and obtained a written statement from them. (FAP Exh. A at 1). Mr. McNutt testified that he wrote the September 21, 2001 statement "when they asked [him] to." (EHT 41). Ms. McNutt testified that "somebody contacted [her and Mr. McNutt]

... and asked [them] to write a letter of what happened." (EHT 65). Petitioner submitted both the statement and the McNutts' declarations as exhibits to his state habeas petitions. (*See, e.g.,* Lodgment 6, Exh. B, C).

12. In his September 21, 2001 statement, Mr. McNutt wrote that he and Mrs. McNutt saw Bunker and Petitioner standing near Harrison's car. (FAP Exh. B at 4). Bunker and Harrison were arguing when Mr. McNutt ap-

ments to prepare for his testimony, although he may have talked about the events with his wife. (EHT 41–42).

b. Elinore McNutt's Testimony

Elinore McNutt is married to James McNutt. (EHT 47). She has had multiple back surgeries and suffers from fibromyalgia. (*Id.*). As a result, Mrs. McNutt has difficulty sitting for extended periods of time. (*Id.*). Mrs. McNutt did not suffer from her current back problems at the time of Petitioner's arrest. (EHT 73). Her medication does not affect her ability to recall events. (*Id.*). She chose not to take any pain medication before the evidentiary hearing so that she could speak clearly. (*Id.*).

Mrs. McNutt testified that she went with Mr. McNutt to the Gold Apple to meet her son on June 6, 1998. (EHT 47–48). She does not recall the time they arrived, but remembers that it was dark. (48). Mrs. McNutt's car was parked facing the bar. (EHT 48–49; *see also* Hearing Exh. 4).[13] Harrison's car was parked facing the other direction, across "a little parking lot." (*Id.*). As Mrs. McNutt walked toward the bar, she saw two men walk up to Harrison's car. (EHT 49). Mrs. McNutt knew one of these men as "Bunker." (*Id.*). Bunker had come to Mrs. McNutt's house a week before and stayed for approximately five minutes. (*Id.*). At the time, Bunker was skinny and had medium length dark hair. (*Id.*). The other man approaching Harrison's car was

Petitioner, who was "chubby" and had short hair. (EHT 49–50).

Mrs. McNutt's attention was on Bunker because the way he walked directly up to Harrison's car door concerned her. (EHT 50). She pointed out Bunker's actions to Mr. McNutt. (*Id.*). While Mr. McNutt walked over to Harrison's car, Mrs. McNutt waited by the tailgate of her car. (EHT 50–51). She could see Petitioner, Bunker, and Mr. McNutt from where she was standing. (EHT 51). Petitioner was standing by Harrison's car's taillights, not by the side of the car. (*Id.; see also* Hearing Exh. 4). Bunker stood by the driver's side of the car and Mr. McNutt stood in front of the driver's door. (EHT 54; *see also* Hearing Exh. 4). Bunker and Harrison argued, but Petitioner was not involved. (EHT 51).

When the police arrived, Bunker turned toward Mrs. McNutt. (EHT 55). She saw Bunker reach into his clothing and throw an object under a car. (*Id.*). Mrs. McNutt testified that she did not know what the object was, but that it was metal and she heard a clank and a "skidding ... noise" when Bunker threw it. (*Id.*). At this time, Petitioner "just stood there" with his hands at his sides, then turned and walked away. (EHT 55–56; EHT 64–65). Petitioner had nothing in his hands. (EHT 56). Mrs. McNutt saw police officers put Petitioner in a car, but did not know that they had arrested Petitioner. (EHT 57).[14]

proached. (*Id.*). Bunker then began to argue with Mr. McNutt. (*Id.*). From where Mr. McNutt was standing, he could see both Bunker and Petitioner clearly. (*Id.*). Someone shouted "5-0," and Mr. McNutt saw Bunker "reach into his waistband and remove and throw something that appeared to be a knife, and sounded metallic when it hit the ground." (*Id.*). Petitioner "had nothing in his hands nor had he made any movements at this time." (*Id.*). Mr. McNutt's 2005 declaration described the same set of facts. (*See* FAP Exh. B at 1–3).

13. Hearing Exhibit 4 is a diagram of the parking lot drawn by Mrs. McNutt. (EHT 52–53). Hearing Exhibit 18a is an enlargement of Hearing Exhibit 4 to which Mrs. McNutt referred at the Hearing. (EHT 53).

14. Like Mr. McNutt, Mrs. McNutt's description of these events has remained consistent over the years. She signed Mr. McNutt's 2001 statement described above in footnote twelve. (FAP Exh. B at 4). On July 21, 2005, Mrs. McNutt signed a declaration that was virtually identical to both the 2001 statement

On cross-examination, Mrs. McNutt testified that although she remembered seeing overhead lighting in the parking lot, she does not remember lights on either the police cars or a helicopter. (EHT 62–63). She did not hear any sirens before the police arrived. (EHT 63). As the police arrived, Mrs. McNutt scanned the parking lot, so her eyes were not on Bunker and Petitioner the entire time. (EHT 72–73). Mrs. McNutt saw Mr. McNutt "being fondled by a police officer," and an officer grabbed her by the hair. (EHT 70–71). She never called the Los Angeles Police Department, the U.S. Attorney's office, or the F.B.I. to complain about her treatment by the police. (EHT 71). Mrs. McNutt testified that she believes "it doesn't do a lot of good to call LAPD." (*Id.*). After the police left, Mrs. McNutt and her husband went into the bar, but only for a short time because Mr. McNutt was so upset. (EHT 59–60). Mrs. McNutt talked to Harrison either later that evening or the next day about what had happened. (EHT 60–62). Before making her July 21, 2005 declaration, (*see* FAP Exh. C), Mrs. McNutt discussed what had happened with Mr. McNutt. (EHT 65–66). She did not discuss anything with Harrison, with whom she did not have much contact. (EHT 66).

Mrs. McNutt admitted that Harrison had been in prison, but she thinks that the police always treated him fairly. (EHT 71–72). She said that it seemed like Petitioner, Bunker, and Harrison knew each other at the time of the incident, but she does not know how they were acquainted. (EHT 71). She does not think that Harrison and Petitioner were friends. (EHT 64).

c. Brian McCracken's Testimony

Brian McCracken admitted that he had been convicted of conspiracy to commit a crime in 1990 and of being a felon in possession of a firearm in 1998. (EHT 75). The Court took judicial notice of his record of convictions.[15] (EHT 89). McCracken began supervised release in 2001. (EHT 76). He has held a job making aircraft components since 2001. (*Id.*). He has not been arrested during his supervised release. (*Id.*).

On June 6, 1998, McCracken was in the Gold Apple bar. (EHT 76). He testified that he does not remember exactly what time he arrived there, but thinks it was around dusk. (EHT 97). McCracken went to the bar alone. (EHT 76). McCracken knew Petitioner at the time, but they were not close friends. (EHT 95). McCracken saw Petitioner in the bar, and was sitting fifteen to twenty feet away from him. (EHT 77).

After McCracken was in the bar for fifteen or twenty minutes, a man approached him and said "you know, I could kill you right now." (EHT 77–78, 97–98). This man was not Petitioner. (EHT 78). The man "flashed" a knife at McCracken.

---

and her testimony at the Hearing. She stated that she saw Bunker and Petitioner walk up to Harrison's car in the parking lot of the Gold Apple bar. (FAP Exh. C at 1). Mrs. McNutt recognized Bunker because she had met him before. (*Id.*). Bunker argued with both Harrison and Mr. McNutt. (FAP Exh. C at 2). Mrs. McNutt heard someone say "5–0," and saw Bunker remove a shiny object from his waistband and throw it under a car. (*Id.*). The object made a metallic sound when it hit the ground. (*Id.*). Petitioner did not move, nor did he have anything in his hands. (*Id.*).

15. McCracken pled no contest to conspiracy to commit a crime (Cal.Penal Code § 182), specifically, shooting at an inhabited dwelling (Cal.Penal Code § 246), in Los Angeles Superior Court on June 28, 1990. On August 16, 1999, McCracken pled guilty to felon in possession of a firearm (18 U.S.C. § 922(g)(1)) in U.S. District Court for the Central District of California. (Respondent's Pre–Hearing Evidentiary Memorandum at 2).

(EHT 77). The knife was double-edged, with a four to five inch long blade and a finger guard. (EHT 81). Petitioner's counsel introduced a photograph of a knife found in Petitioner's trial counsel's file. (EHT 81–82; *see* Hearing Exh. 22). McCracken testified that the knife depicted in the photo found in Petitioner's trial counsel's file looks like the knife he saw in the Gold Apple bar. (EHT 82). McCracken never saw Petitioner with a knife. (*Id.*).

After the man threatened McCracken, McCracken diffused the situation and ordered beer for the two of them. (EHT 82–83). When McCracken was ordering, the bartender told him that she had called the police. (EHT 83). McCracken saw police lights outside the bar, but never went out into the parking lot. (*Id.*).

On cross-examination, McCracken described the man in the bar with the knife as having a medium build and short brown hair. (EHT 91–92). The man was neither skinny nor "chunky." (EHT 92). Although McCracken had difficulty remembering the man with the knife, he was certain of his description of the knife itself. (EHT 93). He focused on the knife because the man threatened to kill him with it. (*Id.*). McCracken drank two beers on the night of the incident. (EHT 97). He had one beer before and one after he saw the knife. (*Id.*).

#### d. Jorji Owen's Declaration

Jorji Owen did not testify at the Hearing, but submitted a declaration.[16] (*See* FAP Exh. D). Owen identified Bunker as William Hewitt, her boyfriend. (FAP Exh. D at 1). According to Owen, on June 6, 1998, Hewitt, Petitioner, and two other men went to a bar. (*Id.*). When Hewitt returned from the bar, he told Owen that

Petitioner "had been arrested for possession of his (Hewitt's) knife, and that he (Hewitt) has [sic] tossed the knife under a truck when the police arrived at the bar." (*Id.*). Hewitt sold his motorcycle to bail Petitioner out of jail, because he felt responsible for Petitioner being in jail. (FAP Exh. D at 1–2). Owen stated that Hewitt felt responsible because the knife belonged to him and he had thrown it under a truck when the police arrived. (*Id.*).

#### e. William Hewitt's Declaration

William Hewitt did not testify at the Hearing. He executed a declaration on January 15, 2001. (FAP Exh. F). Hewitt stated that he was with Petitioner when Petitioner was arrested. (*Id.*). He further stated: "I know that the knife was not [Petitioner's], because it was mine." (*Id.*).

### F. *Petitioner's Evidence Satisfies The Schlup Standard*

The Supreme Court in *Schlup* held that:

if a petitioner ... presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

*Schlup*, 513 U.S. at 316, 115 S.Ct. 851. The Court later clarified that in order to pass through the *Schlup* gateway, a petitioner must "demonstrate that more likely than not, in light of [new evidence presented to the Court], no reasonable juror would find him guilty beyond a reasonable

---

16. On February 24, 2992, Owen pled guilty to forgery of access cards to defraud (Cal.Penal Code § 484f(a)) in Los Angeles Superior Court. (Respondent's Pre–Evidentiary Hearing Memorandum at 2). The Court takes judicial notice of this conviction.

doubt." *House*, 547 U.S. at 538, 126 S.Ct. 2064.

Because Petitioner's trial counsel did not call any witnesses at trial, the jury relied entirely on the testimony of Officer Townsend, Officer Rex, and Detective Crocker. Officer Townsend and Rex were percipient witnesses who testified that they were approximately twenty feet away from Petitioner when they saw him throw an object. Both Townsend and Rex testified that they had unobstructed views of Petitioner. Because Townsend and Rex were police officers, jurors may have given their testimony significant weight.

Petitioner's trial counsel attempted to discredit Townsend and Rex's testimony. He presented conflicting evidence from Townsend about whether he was driving the police car or was the passenger. Petitioner's counsel suggested that Townsend changed his testimony regarding concealment at the behest of the prosecutor because the crime of possession of a dagger requires that the dagger be concealed. Petitioner's trial attorney argued that it was unlikely that Petitioner squatted down with an unsheathed, extremely sharp knife inside his pants without cutting his leg or his clothing. (*See* 2 RT 278). Petitioner's trial attorney tried to discredit the prosecution's witnesses. However, he failed to call any witnesses or present any contrary evidence to demonstrate that someone other than Petitioner possessed the knife.

### 1. The Evidentiary Hearing Testimony Causes This Court To Lack Confidence In The Outcome Of Petitioner's Trial

This Court finds that the McNutts were credible and persuasive witnesses. The McNutts have no apparent reason to perjure themselves for Petitioner's benefit. Mr. McNutt is a correctional officer and was a police officer for many years. Both Mr. and Mrs. McNutt were standing at least as close, if not closer, to Petitioner as were Townsend and Rex, and it appears that Mr. McNutt was standing between Petitioner and the police officers. (*See* Hearing Exh. 4, 105). Both Mr. and Mrs. McNutt had unobstructed views of Bunker and Petitioner, unlike Townsend and Rex, who were looking through a chain link fence. Mr. McNutt was standing only two feet away from Bunker. Both Mr. and Mrs. McNutt testified unequivocally that it was Bunker, not Petitioner, who threw something metallic sounding under a nearby car. Mr. McNutt was certain that this metallic object was not a copper bar.

McCracken also gave credible testimony at the Hearing. Although he was not a percipient witness to the events in the parking lot, McCracken did provide circumstantial evidence that Petitioner was not the individual who possessed the knife. McCracken's care to limit his testimony speaks to his credibility. He was forthright about not seeing the events outside the bar. He admitted that he did not know the person who threatened him with the knife. However, McCracken was certain that the person with the knife in the bar was not Petitioner. McCracken knew Petitioner at the time of the incident, though they were not close friends, and McCracken saw Petitioner elsewhere in the bar when an unknown man threatened McCracken. Additionally, McCracken's description of the knife used to threaten him matched the knife found in Petitioner's trial counsel's files.

" 'To be credible,' a gateway claim requires 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.' " *House*, 547 U.S. at 537, 126 S.Ct. 2064 (quoting *Schlup*, 513 U.S. at 324, 115 S.Ct. 851). McCracken and the McNutts gave trustworthy eyewitness ac-

counts at the evidentiary hearing. Petitioner has presented enough evidence to cause the Court to lack confidence in the outcome of Petitioner's trial. *See id.* at 776, 126 S.Ct. 2064.

The conflict in this case between the trial evidence and the evidentiary hearing testimony is similar to the conflict in *Schlup.* In *Schlup,* the evidence at trial consisted primarily of the testimony of two correctional officers who were percipient witnesses to a stabbing. *Schlup,* 513 U.S. at 302, 115 S.Ct. 851. During his habeas process, Schlup presented "the sworn statements of several eyewitnesses that Schlup was not involved in the crime" and statements from people who did not see the crime take place but nonetheless cast doubt on whether Schlup could have participated in the murder. *Id.* at 331, 115 S.Ct. 851.

In the instant case, the evidence at trial consisted primarily of the testimony of two police officers who were percipient witnesses to someone throwing a knife. At the evidentiary hearing, Petitioner presented testimony from two eyewitnesses that Petitioner was not involved in the crime, as well as testimony from another witness who did not see the events take place but nonetheless cast doubt on whether Petitioner was the person with the knife. In addition to the live testimony, Petitioner submitted declarations from Owen and Hewitt that support the conclusion that Petitioner did not possess or throw the knife. As the Supreme Court found in *Schlup,* given this evidence, "it surely cannot be said that a juror, conscientiously following the judge's instructions requiring proof beyond a reasonable doubt, would vote to convict." *Id.*

### 2. Respondent's Arguments Are Not Persuasive

Respondent argued at the Hearing that Petitioner's new evidence did not unques-

tionably establish his innocence. (EHT 107–08, 116). Respondent misstates the standard. A freestanding actual innocence claim under *Herrera* "would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish [Petitioner's] innocence," but "if the habeas court were merely convinced that those new facts raised sufficient doubt about [Petitioner's] guilt to undermine confidence in the result of the trial" then a review of the merits of Petitioner's constitutional claims would be appropriate. *Schlup,* 513 U.S. at 317, 115 S.Ct. 851. Petitioner's evidence clearly raises questions about his guilt and undermines confidence in his conviction.

In her closing argument, Respondent's counsel tried to cast doubt on the McNutts' testimony. She noted that Mrs. McNutt testified that she "looked around" the parking lot when the police arrived. (EHT 112). Respondent's counsel argued that Mr. McNutt must have been similarly distracted by the police, so neither could have been watching Petitioner and Bunker the entire time. (*Id.*). If the fact that a witness's eyes left Petitioner and Bunker for a moment is enough to cast doubt on that witness's credibility, then Respondent's argument applies equally to Officer Townsend, who testified that he tried to eliminate his tunnel vision on Petitioner by forcing himself to look around the parking lot. More importantly, neither Mr. nor Mrs. McNutt were equivocal about who they saw throw the metallic sounding object. They were both certain it was Bunker, not Petitioner. Mr. McNutt was standing only two feet away from Bunker when Bunker threw the object. Mrs. McNutt was slightly farther away, but she had met Bunker before and was unlikely to confuse him with Petitioner.

Respondent also suggested that the McNutts' testimony lacked credibility be-

cause they did not remember the police lights and sirens that, according to Respondent, must have been visible and audible in the parking lot. (EHT 112–13). Respondent noted that a helicopter with lights on and many police cars with headlights and spotlights were at the scene. (EHT 112). Additionally, again according to Respondent, some of the police cars would have had their sirens on due to the nature of the call. (EHT 112–13). The McNutts, eleven years later, did not remember what lights they saw or what sirens they heard. The Court finds that Respondent's arguments do not undermine the McNutts' credibility. These are minor discrepancies that do not cast doubt on the McNutts' clear and consistent memories of seeing Bunker, not Petitioner, throw the object.

Respondent's counsel also insisted that the McNutts' testimony was biased because the McNutts held a grudge against the Los Angeles Police Department due to the officers' treatment of the McNutts at the scene. (EHT 111). Admittedly, Mr. McNutt was upset about the way the police officers searched him. He testified that he was a "nervous wreck" afterwards. Nevertheless, it is unbelievable that these emotions alone would cause a former police officer to fly across the country and testify falsely under oath, let alone maintain that false testimony for years. It is also unbelievable that the McNutts, despite Mrs. McNutt's medical problems that make it difficult for her to sit for an extended period of time, would travel long distances to give perjurious testimony on behalf of Petitioner, with whom they have no ties.

Respondent's counsel also tried to discredit McCracken's testimony by discussing his past convictions. Although it is true that McCracken does not have an unblemished record, his last conviction was in 1998. After beginning supervised release in 2001, he has held down a steady job and has remained crime free. His convictions, which are more than a decade old, do not render his testimony incredible.

Respondent's counsel also tried to cast doubt on McCracken's testimony by arguing that it was "bizarre" for McCracken to buy a beer for someone who had just threatened him with a knife. (EHT 115). Respondent's counsel flippantly suggested that "maybe this is the type of bar that folks that have knives frequent." (*Id.*). McCracken's actions may seem atypical in retrospect. It is nonetheless difficult to believe that McCracken perjured himself on Petitioner's behalf. McCracken testified that he and Petitioner are not close friends. To date, McCracken has been successful on supervised release, but would presumably suffer serious consequences from a perjury conviction. McCracken has no apparent reason to perjure himself on Petitioner's behalf, and has an obvious incentive to tell the truth under oath. However, even if the Court were to discount McCracken's testimony, the testimony received from the McNutts would be enough to erode the Court's confidence in the outcome of Petitioner's trial.

Respondent's counsel attempted to bolster the credibility of Officers Townsend and Rex by arguing that their testimony underwent extensive cross-examination at trial. (EHT 115–16). Petitioner's trial counsel questioned Townsend about why he only testified that Petitioner had concealed the knife after the charges against Petitioner had been dismissed for insufficient evidence and the prosecuting attorney explained to him the necessary element of concealment. (EHT 115). Petitioner's trial attorney was also able to question Townsend about his inconsistent testimony concerning whether he was the passenger or driver of the police car, and whether he or Rex had wielded

the shotgun. (EHT 116). According to Respondent, "these inconsistencies were resolved by the jury." (EHT 115).

In resolving these inconsistencies, however, the jury did not have the opportunity to consider conflicting testimony from credible witnesses. Petitioner's trial counsel failed to proffer evidence suggesting that someone other than Petitioner may have thrown the knife. The jury did not hear testimony that someone other than Petitioner may have had the knife inside the Gold Apple bar. Nor did they hear testimony from two credible eyewitnesses that it was Bunker, not Petitioner, who threw the knife. The jury did not have evidence before it that the knife belonged to Hewitt (Bunker), not Petitioner, as stated in the Hewitt and Owen declarations. The jury could not weigh the inconsistencies in Townsend and Rex's testimony against the conflicting testimony of Mr. McNutt, a retired chief of police who testified that he was standing two feet away from Bunker when Bunker threw the knife. The jury may not have concluded that Townsend and Rex were lying on the stand, but had the jury heard the McNutts and McCracken testify, a reasonable juror would have had serious doubts about Townsend and Rex's version of the events.

Ultimately, Respondent's attorney argued that Townsend and Rex should be believed because they had a continuous view of both Petitioner and the object found under the car. (EHT 116). According to Respondent, Townsend and Rex focused on Petitioner because he matched the description of a person thought to be armed with a gun. (EHT 113). This argument does not prove Petitioner's guilt given that Mrs. McNutt appears to have been as close to Petitioner as were Townsend and Rex, and Mr. McNutt was substantially closer. Mrs. McNutt testified that she focused on Bunker because she was concerned with the way he walked directly up to her son's car door. Mr. McNutt testified that he focused on Bunker because Bunker was being hostile. The McNutts had unobstructed, continuous views of Petitioner and Bunker, and each witness was certain that it was Bunker who threw the object under the truck.

The Court finally notes that Petitioner has consistently proclaimed his innocence. Respondent argues that there should be no actual innocence exception to AEDPA's statute of limitations because "[a]lmost no petitioner who is actually innocent would choose to remain silent about his federal habeas claims for more than a year. Rather, he or she has a powerful and natural incentive to seek help from the courts as soon as possible." (Motion at 6). Petitioner did not remain silent about his innocence. At trial, he pled not guilty. (FAP at 2). In his declaration in support of his Petition, Petitioner stated that he asked his trial attorney to present exculpatory evidence from Hewitt, Owen, and others. (FAP Exh. E). When Petitioner became aware of the McNutts' exculpatory testimony, he asked his trial attorney to move for a new trial and unequivocally stated, "I'm innocent." (*Id.*; FAP Exh. L).

Petitioner continued to assert his innocence after his conviction. Between his conviction in 1999 and the start of the California Innocence Project's representation in 2002, Petitioner contacted nine different attorneys or legal organizations for assistance in proving his innocence. (*See* FAP Exh. E at 2–3). Not only has Petitioner consistently proclaimed his own innocence, but Petitioner's supporting witnesses have as well. The McNutts, who appear to have no other connection with Petitioner, have testified credibly to Petitioner's innocence for approximately eight years. In statements made informally, under oath in a declaration, and under oath

in live testimony before the Court, the McNutts have maintained a consistent version of events. This appears to be one of the "*extraordinary* cases where the petitioner asserts his innocence and establishes that the court cannot have confidence in the contrary finding of guilt." *Johnson,* 541 F.3d at 937.

## IV.

### CONCLUSION

After weighing the trial evidence with that presented at the Hearing as well as the evidence lodged with the current Petition, this Court lacks confidence in the outcome of Petitioner's trial. The Court concludes that, had the jury been able to consider this same evidence, "no reasonable juror would [have found Petitioner] guilty beyond a reasonable doubt." *House,* 547 U.S. at 538, 126 S.Ct. 2064. Petitioner therefore passes through the *Schlup* gateway. The Court may proceed to consider the merits of his ineffective assistance of counsel claim. The Court will issue a separate order scheduling future proceedings.

## V.

### RECOMMENDATION

IT IS RECOMMENDED that the District Court issue an Order (1) accepting and adopting this Report and Recommendation and (2) denying the Motion to Dismiss.